**SAMUEL FRIEDLAND FOUNDATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. 933–54.

United States District Court
D. New Jersey.
Aug. 24, 1956.

Stein, Stein & Engle, by Theodore C. Baer, Jersey City, N. J., for plaintiff. Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D. C., by John W. Scott, Jr., Carolyn Agger, Washington, D. C., of counsel.

Herman Scott, Asst. U. S. Atty., Passaic, N. J., by Fred Neuland, Washington, D. C., for the Government.

WORTENDYKE, District Judge.

The significant issue in this case involves the extent to which a charitable organization may accumulate income without losing its tax-exempt status under the accumulation limitations imposed by a section of the Revenue Act of 1950, 64 Stat. 957, 26 U.S.C.A. § 3814.[1] Al-

---

1. Section 3814, added to the Internal Revenue Code of 1939 by the Revenue Act of 1950, reads as follows:

"In the case of any organization described in section 101(6) [see footnote 3] to which section 3813 is applicable, if the amounts accumulated out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year—

"(1) are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose or function constituting the basis for such organization's exemption under section 101(6); or

"(2) are used to a substantial degree for purposes or functions other than those constituting the basis for such organization's exemption under section 101(6); or

"(3) are invested in such a manner as to jeopardize the carrying out of the charitable, educational, or other purpose or function constituting the basis for such organization's exemption under section 101(6), exemption under section 101(6) shall be denied for the taxable year."

though not bearing upon the disposition of this case, it is interesting to note that this section has been carried over into the Internal Revenue Code of 1954,[2] making the subject of more than passing interest. Since this case is controlled by the Internal Revenue Code of 1939, as amended, all references in the course of this opinion are to sections of the 1939 Code and regulations thereunder, unless the contrary is indicated.

The matter of income accumulation arises, along with some other questions, in this proceeding by the Samuel Friedland Foundation to recover $57,154.49 representing income taxes which it paid for the years 1951 and 1952. The Foundation's claim for refund is based upon the contention that during the two years mentioned it was exempt from income tax as a charitable organization under Section 101 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 101 [3] and that the amendments made by the Revenue Act of 1950 [4] were not applicable to the Foundation, or if they were applicable they did not effect any loss of exemption as to the Foundation. The Government takes the extreme position that the Foundation by the very nature of its certificate and operation is not an organization exempt from tax under Section 101 and that if it were it lost its exemption for the years 1951 and 1952 by an accumulation and use of income proscribed by Section 3814.

The facts are virtually undisputed, both parties relying upon contentions as to the interpretation and application of the pertinent statutory provisions. For convenience all of the facts are set forth in a footnote [5].

Section 3813 referred to in Section 3814 applies to all charitable organizations *except*

"(1) a religious organization (other than a trust);

"(2) an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on;

"(3) an organization which normally receives a substantial part of its support (exclusive of income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 101 (6)) from the United States or any State or political subdivision thereof or from direct or indirect contributions from the general public;

"(4) an organization which is operated, supervised, controlled, or principally supported by a religious organization (other than a trust) which is itself not subject to the provisions of this section; and

"(5) an organization the principal purposes or functions of which are the providing of medical or hospital care or medical education or medical research."

2. Sections 3813 and 3814 appear as Sections 503 and 504 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 503, 504.

3. Section 101(6) provides an exemption from income tax for

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."

4. In addition to Sections 3813 and 3814, already referred to, the 1950 Act amended Section 101 by placing at the end of that section the following provision:

"An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of this section on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation. For the purposes of this paragraph the term 'trade or business' shall not include the rental by an organization of its real property (including personal property leased with the real property)."

5. Almost all of the facts were stipulated by the parties. The pertinent facts, including those stipulated and some additional facts found by the Court, are these:

A. Organization of the Samuel Friedland Foundation

Samuel Friedland was the founder of Food Fair Stores, Inc. (herein referred

The questions raised by the Government's numerous arguments as to why the Foundation is not entitled to a refund of income taxes for the years involved are basically these:

Is the Foundation exempt from income tax under Section 101? Is the Foundation, within the meaning of Section 3813, "an organization the principal purposes or functions of which are the providing

to as FF), a nation-wide merchandising company operating food stores of the super-market type. Sometime before 1949, Mr. Friedland became chairman of the board of FF.

For many years, Mr. Friedland has been interested in charitable organizations, particularly hospitals and institutions for medical education and research. He was a founder, director and financial supporter of Mt. Sinai Hospital in Miami Beach. As chairman of the board of FF, he recommended that the company make charitable contributions, and sizeable donations were made to the University of Pennsylvania Medical School, Temple University Medical School, Charles Bailey Cardiac Foundation, Radvin Institute for Cancer Research, Hahneman Hospital, Northeast Hospital, Lankenau Hospital, Mt. Sinai Hospital and other hospitals.

In 1949 Mr. Friedland's personal interest in medical charity moved him to establish a separate foundation bearing his name. As a result, on December 31, 1949 the Samuel Friedland Foundation was incorporated under the laws of the State of New Jersey as a non-profit, non-stock corporation. The purposes of the Foundation were "to accumulate and distribute its funds exclusively for religious, charitable, scientific, literary or educational purposes, including the relief of the poor and of the needy regardless of race, color or creed", to make contributions to tax-exempt charitable organizations, and "to establish or provide scholarships and fellowships for worthy and qualified persons without regard to sex, nationality, race, color or creed." No part of the net earnings of the Foundation were to inure to the benefit of any member, trustee or other individual, and the Foundation was not permitted to engage in carrying on propaganda or otherwise attempting to influence legislation. The affairs of the Foundation were entrusted to a board of trustees which was given power to take, hold and transfer real and personal property free from any restrictions applicable to the investment of trust funds. The original board of trustees consisted of Samuel Friedland, his wife, Louis Stein (vice-president of FF) and two sons of Mr. Friedland. Although the purposes of the Foundation were stated in general terms, it is

clear that medical charity was to be its principal object.

Following the enactment of the Revenue Act of 1950 adding Sections 3813 and 3814, referred to elsewhere herein, the Foundation amended its certificate of incorporation. Since the Foundation was to be devoted in the main to medical charity, the trustees desired to take whatever advantage was offered by the exempting provisions of Section 3813(a) (5). The amendment to the certificate, made in April, 1951, provided that the purposes of the Foundation henceforth would be as follows:

"(a) The principal purposes and functions of the corporation are the providing of medical care, hospital care, medical education and medical research; and the accumulation, distribution and contribution of its funds for such purposes and functions."

It may be noted that the amended statement of purposes closely followed the statutory language of Section 3813(a) (5) and that accumulation of funds was specifically authorized. The amendment further recited:

"(b) The corporation may contribute its funds to any corporation, trust, community chest, fund or foundation organized and operated exclusively or principally for the purposes and functions of providing medical care, hospital care, medical education or medical research * * *

"(c) The corporation may establish or provide medical scholarships and fellowships for worthy and qualified persons without regard to sex, nationality, race, color or creed.

"(d) The corporation may, in addition to its principal purposes and functions as hereinabove set forth in subparagraph (a) hereof, distribute such minor portions of its funds which are not required for the principal purposes and functions set forth in subparagraph (a) hereof, for religious, charitable, scientific, literary or educational purposes and make contributions to any corporation, trust, community chest, fund or foundation organized and existing exclusively for religious, charitable, scientific, literary or educational purposes * * *."

At the same time the powers of the Trustees were amended so as to authorize them

of medical or hospital care or medical education or medical research"? If not, were the amounts accumulated by the Foundation out of income (a) unreason-

"To take and hold by gift, purchase, grant, lease, devise, bequest or otherwise any property, real or personal, or any interest therein, without limitation as to amount or value, necessary or desirable for attaining the objects and carrying into effect the purposes of the corporation; to sell, transfer, convey and dispose of such property; to borrow money for the purposes of the corporation and issue bonds therefor and secure the same by mortgage; to invest, reinvest and deal with the same and expend the income therefrom or the principal thereof for any of the aforementioned purposes subject only to such limitations as may be contained in the instrument under which such property is received but free from any restrictions applicable to the investment and reinvestment of trust funds; and to exercise any corporate powers necessary or incidental to the exercise of the powers above enumerated."

The amended certificate contained these limitations:

"(e) The corporation is not organized for profit and no part of its net income shall inure to the benefit of any member, trustee or other individual. The corporation shall not engage nor shall any of its funds, property or income be used in carrying on propaganda or otherwise attempting to influence legislation, nor shall any of its funds, property or income be contributed to any undertaking, a substantial part of the activities of which is carrying on propaganda or otherwise attempting to influence legislation."

Immediately after the amendment of the certificate of incorporation, Dr. Abram Sachar, president of Brandeis University, and Dr. Louis Finkelstein, chancellor of Jewish Theological Seminary, replaced the two sons of Mr. Friedland on the board of trustees of the Foundation.

### B. Operation of the Foundation

#### Contributions to the Foundation:

| Donor | Gift | Value at date of Gift | Total |
|---|---|---|---|
| **1949** | | | |
| Samuel Friedland | 2,000 shares FF Common | $29,250 | |
| Hasaam Realty | 1,000 shares FF Common | 14,625 | $ 43,875 |
| **1950** | | | |
| Samuel Friedland | 2,000 shares FF Common | 29,250 | |
| Louis Stein | Cash | 4,000 | 33,250 |
| **1951** | | | |
| Samuel Friedland | 1,500 shares FF Common | 30,750 | |
| Hasaam Realty | 1,350 shares FF Common | 31,050 | |
| Louis Stein | 1,250 shares Official Films, Inc. Common | 2,700 | |
| Aronovitz & Aronovitz | Cash | 2,500 | |
| Stein & Stein | Cash | 2,000 | 69,000 |
| **1952** | | | |
| Samuel Friedland | 28 Bonds Monte Carlo Hotel Co. | 28,800 | |
| | Endowment policy on life of donor | 20,000 | |
| Hasaam Realty | 150 shares FF Common | 3,450 | 52,250 |
| | | | $198,375 |

Hasaam Realty Corp., wholly-owned by Mr. Friedland and his family, has for some time held the controlling stock interest in FF.

*Investment Advice:*

The Foundation received investment advice from Samuel Friedland, its president and trustee, and Louis Stein, a trustee and general counsel. Mr. Friedland's business and investment experience was not limited to his development of FF, which in itself has been a considerable financial venture. He has built and owned one hotel in Miami Beach and owned the major interest in another hotel located in the same city. He has also bought and

able in amount, (b) used to a substantial degree for non-charitable purposes, or

(c) invested in such manner as to jeopardize the charitable purpose or function

sold land in that area. Mr. Stein, an attorney, was vice-president of FF and also its general counsel.

The Foundation has never made any investment which was in any way to the benefit of FF, Mr. Friedland, his family, or any trustee of the Foundation. The only investment in any enterprise in which any of the foregoing had any interest was in the stock of FF, and it is clear that the only reason such investment was made was because Mr. Friedland considered the acquisition of the stock at the particular time an excellent investment opportunity with a strong possibility of capital gain. The stock acquired by the Foundation amounted to about 2% of the outstanding shares and left Mr. Friedland and his family with over a 24% interest in the company. Admittedly the Foundation has never engaged in any of the so-called "prohibited transactions" specified in Section 3813.

Without exception, Mr. Friedland was financially able to have made for his own account all of the investments made by the Foundation. In no instance has the Foundation ever taken a loss on any of the investments which it made.

*Accumulation of Funds:*

In 1950, the first year of operation of the Foundation, Samuel Friedland and Louis Stein discussed its program between themselves and subsequently with Dr. Sachar, president of Brandeis University. Mr. Friedland advised Dr. Sachar that he was interested in medicine and medical research and that he would like to have the Foundation "Do something real big towards research," such as building and equipping a medical research building. According to further testimony of Mr. Friedland

"* * * he (Dr. Sachar) told me he thinks it is a wonderful thing, and Brandeis University especially can use that type of building for medical research. * * * We asked Dr. Sachar what the cost would be and he told us it would be close to $500,000 to build the building and the equipment * * * We actually committed ourselves to go ahead and find a way to raise $500,000 for that research building. We did not have the money at that time because the Foundation was still young, just in the beginning. * * * I told Dr. Sachar that I thought—and Mr. Stein agreed with me—that within about four or five years we could have that money."

As to how the Foundation planned to acquire the amount referred to, Mr. Friedland testified:

"* * * Hasaam and myself gave $50,000 a year for the Foundation, and I figured between four and five years would be two hundrded fifty thousand dollars additional gifts, plus, I figured to try to get investments which would be safe enough and still have increase in values. * * * Of course, we always had in mind the safety of the investments, that it must be secured well enough so that we would not lose what we have."

This testimony was unchallenged, and I find as a matter of fact that in 1950 the Foundation committed itself to the donation and the program of operation testified to by the founder and president, and furthermore that Mr. Friedland would under normal circumstances make annual contributions to the Foundation in approximately the amount mentioned from his own funds and from those of Hasaam.

While the certificate of incorporation provided for the accumulation of funds, it was neither the policy nor practice of the Foundation to amass large amounts of money unrelated to any particular object. Nor was it the Foundation's plan to accumulate all income even for the Brandeis University gift. The amounts accumulated and distributed during 1951 and 1952 are reflected in the statements of "Income and Expenses" and "Distributions" appearing below. The policy of the Foundation on this matter is exemplified by the manner in which a request of Mt. Sinai Hospital in Miami Beach was handled. Late in 1950, Max Orovitz, the president of the hospital, approached Mr. Friedland and advised him that the hospital was in need of a research building. Mr. Friedland explained that the Foundation had made a commitment to Brandeis University to direct its efforts largely towards raising a $500,-000 gift. Mr. Friedland advised that the Foundation would continue to make annual donations to the hospital, the development of which was of major interest to Mr. Friedland, who was one of its founders. Later the Foundation committed itself to give the hospital a total of $125,000 over a five-year period. The annual payments were to be made out of dividends and interest received by the Foundation on securities acquired prior to the commitment.

It is not disputed that if the income taxes paid by the Foundation for the

of the Foundation, within the meaning of Section 3814?

[1] Before turning to these specific questions, it is helpful to consider the

years 1951 through 1954 (approximately $175,000) were included the Foundation would have reached its goal of $500,000 for distribution to Brandeis University by the beginning of 1955. Even after distribution of the gift to Brandeis University, the Foundation still would have had a substantial capital fund for promoting its stated purposes.

*Investments:*

As already noted above under "Contributions," the Foundation acquired by gift investments in the common stock of FF, the common stock of Official Films, Inc., bonds of Monte Carlo Hotel Co., and an endowment policy on the life of Mr. Friedland. During the years 1951 and 1952, the Foundation had the following additional investments:

The Park Central Hotel Second Mortgage

This hotel was an 80-room fire-proof building facing the ocean at Miami Beach. The first mortgage on the hotel was approximately $105,000. The face amount of the second mortgage was $165,000 but the Foundation purchased a one-half interest in this mortgage for $75,000 in 1950. The value of the hotel property was much greater than the total mortgage indebtedness. Payments received by the Foundation on account of principal during the year 1951 were $20,000 and during 1952 were $17,000.

The Casablanca Hotel Third Mortgage and Notes

This hotel, an 8-story fire-proof building with 260 rooms, was built in Miami Beach in 1950. The Foundation purchased a third mortgage on the hotel in May 1951. At this time the hotel was worth approximately $4,000,000 and was in fact sold for that amount in 1952. The first and second mortgages totalled only $1,375,000. The face amount of the third mortgage was $805,000 but it was acquired by the Foundation for $600,000. Although the mortgage was not due until 1956, it contained a provision that it might be prepaid in 1952 for $721,000, and prepayment was made in accordance with this provision. The profit to the Foundation on this transaction was $121,000.

The Foundation also purchased conditional sales notes on the furniture in the Casablanca Hotel. The purchase price of the furniture was $688,054.49. The notes were guaranteed both by the

hotel and the company from which the Foundation purchased the notes. The notes in the amount of $403,054.49, at 6% interest, were acquired by the Foundation in April 1951 for $368,695.48. After the debtor had paid $128,054.49 on account the Foundation sold the notes in October 1951 for $275,000. The profit on this transaction was $34,359.01.

The Jackson County, Missouri V. A. Construction Mortgages

In March 1951 the Foundation advanced $75,000 on construction mortgages on one-family dwellings being constructed for veterans under the Veterans Administration Act in Jackson County, Missouri. The selling price of each house was to be $10,400 and the construction mortgage per house was $6,000. The mortgages bore interest at the rate of 5%. Payments on account of principal were received in 1951 and 1952 so that as of the end of 1952 the balance remaining unpaid was $7,150.

The Sun Tan and Palm Vel Buildings Mortgages

The Sun Tan and Palm Vel Buildings in Hialeah, a suburb of Miami, are shopping centers. The Foundation purchased a mortgage covering both buildings, face amount $100,000, for $75,000 on February 8, 1952. FF had a twenty-one-year lease on the Sun Tan Building and as additional security for the mortgage the rent due under the lease, which exceeded the amount of the mortgage was assigned to the Foundation in case of mortgage default. The Foundation sold the mortgage for its face value on April 29, 1952. The profit on this transaction was $25,000.

Securities

In May 1951 the Foundation purchased from Mr. Friedland 55,000 shares of FF common stock at $20.00 per share. At that time, the stock was being traded on the New York Stock Exchange between $20.50 and $21.00 per share.

The Foundation held 100 shares of the common stock of Palestine Economic Corporation, purchased on the open market for $2,800.00. It also held a $1,000 3% Debenture of the Miami Beach Jewish Center, purchased in June 1951.

Church Mortgage

In October 1952, the Foundation loaned $17,500 to a religious organization in Miami Beach, secured by a 4% mortgage on the dwelling of Rabbi Irving Lehrman.

tax exemption created by Congress for the benefit of charitable organizations. The term "charitable" is only one of a number of adjectives appearing in Section 101(6) descriptive of organizations which may be exempt from tax. However, the term has been commonly used in its generic sense as embracing all such adjectives including "educational" and "scientific", and it will be so used here.

The exemption from income tax for charitable organizations has been in existence for many years in the company of comparable sections relieving charitable organizations from other Federal taxes and encouraging gifts and bequests

The Foundation sold the Official Films, Inc. common stock in May 1951, and 2,-000 and 500 shares of FF common stock donated to the Foundation were sold in October and December 1951, respectively.

*Use of Borrowed Funds:*

In several instances the Foundation borrowed funds or incurred indebtedness in connection with its investments. The funds were borrowed from Mr. Friedland, Hasaam (which Mr. Friedland and his family owned), and a small amount from Mrs. Friedland. In connection with one investment a loan was obtained from a bank.

The Foundation borrowed $70,000 from Mr. Friedland and $80,000 from Hasaam for the purchase of the Park Central Hotel mortgage. These loans were without interest, and were repaid within nine months.

It borrowed $195,000 from Mr. Friedland and $80,000 from Hasaam for the purchase of the Casablanca Hotel mortgage, and $400,000 from Mr. Friedland for the conditional sales notes on the furniture of that hotel. No interest was charged on these loans, and they were largely repaid within the year. For the purchase of the 55,000 shares of FF common stock, the Foundation borrowed $800,000 from Mr. Friedland and $300,-000 from the Philadelphia National Bank,

plus an additional $500,000 from the bank to repay Mr. Friedland's loan in part. These loans were repaid in full by the end of 1954.

It was never intended that the Foundation would make a practice of investing through the use of borrowed funds. Such funds were used in 1951 and 1952 only because the Foundation had been so recently organized as to be without sufficient funds to enable it to avail itself of certain investment opportunities and because the Foundation was endeavoring to build up a fund in order to be able to make the contemplated gift to Brandeis University as soon as possible. Once that goal was attained, it was not contemplated that further borrowing for investment purposes would be engaged in. Rather it was the intention of the board of trustees that once the gift to Brandeis University had been made all future distributions by the Foundation would be from dividends received on the FF common stock held by the Foundation (providing approximately $50,000 per year), and contributions from Mr. Friedland and Hasaam, estimated at $50,000 per year under then existing conditions. As a matter of fact, in 1952 the Foundation ceased incurring indebtedness for the acquisition of investments.

*Income and Expenses:*

| | 1949 | 1950 | 1951 | 1952 |
|---|---|---|---|---|
| **Income** | | | | |
| Contributions | $43,875.00 | $33,250.00 | $69,000.00 | $52,250.00 |
| Dividends and Interest | — | 9,341.11 | 44,622.50 | 64,156.18 |
| Capital Gains * | — | 9,818.94 | 54,504.87 | 146,000.00 |
| Total | $43,875.00 | $52,410.05 | $168,127.37 | $262,406.18 |
| **Expenses** | | | | |
| Interest on loans | — | — | $ 4,583.33 | $ 24,220.83 |
| Miscellaneous | — | $48.37 | 138.03 | 1,031.57 |
| Total | — | $48.37 | $4,721.36 | $25,252.40 |

* Where figures given include a capital gain on an asset donated to the Foundation, the amount of the gain represents the difference between the fair market value on the date of gift and the amount realized by the Foundation upon sale.

to such organizations by excluding donations to varying extents from the donors' income and estate tax bases.[6] Hardly any change has occurred in the criteria or language of these provisions since their earliest employment. Up until 1950,

No salary, other compensation or expenses were paid to any officer, trustee or other person in connection with the operation of the Foundation.

*Distributions:*

| Distributions were made to: | | 1951 | 1952 |
|---|---|---|---|
| Mt. Sinai Hospital | | $10,000 | $15,500 |
| Miami Beach Jewish Community Center | | 4,345 | 150 |
| Jewish Theological Seminary of America | Δ | 1,000 | 1,000 |
| Brandeis University | | 1,000 | 1,000 |
| University of Chicago | | 500 | 500 |
| Mirrer Yeshiva Institute | | 100 | 100 |
| Jewish Home for Aged | | 1,000 | — |
| Hebrew Academy | | 500 | — |
| Congregation Sollovey Emuney Israel | | 500 | — |
| First Jewish Congregation | | 300 | — |
| Beth David Congregation | | 100 | — |
| National Children's Cardiac Home | | 100 | — |
| Dade County Cancer Institute | | — | 1,020 |
| Reise Davis Clinic | | — | 1,000 |
| Hertzell Group of Hadassah Medical Bldg. | | — | 1,000 |
| Miami Heart Institute | | — | 300 |
| Bureau of Jewish Education | | — | 250 |
| St. Francis Hospital | | — | 200 |
| Milton Hillman, Medical Student | | — | 100 |
| American Jewish Committee | | — | 14 |
| Rabbi Jacob David School | | — | 10 |
| American Friends of the Hebrew University, Inc. | | — | 10 |
| Total | | $19,445 | $22,154 |

**C. Rulings of the Commissioner and Income Taxes Paid**

On October 22, 1952 the Commissioner ruled that the Foundation was entitled to exemption under Section 101(6) for the years 1949 and 1950. The Commissioner, however, deferred decision respecting the status of the Foundation for the year 1951 and subsequent years in order to consider the effect of the provisions of the Revenue Act of 1950, referred to in footnotes 1 and 4, upon exemption for these years.

Thereafter, on May 6, 1953, the Commissioner ruled that the Foundation was "not entitled to exemption from Federal income tax under the provisions of section 101(6) of the Code for 1951 and subsequent years *in view of the requirements of section 3814* of the Code." (Emphasis supplied.) The particular activity of the Foundation upon which the Commissioner based his ruling was described as follows: " * * * it is apparent that your funds consisting in part of contributions and loans from Mr. Friedland and a corporation controlled by him are being used to a·substantial degree for the purpose of purchasing stock valued at $1,100,000.00 from Mr. Friedland." The arguments of the Government in this litigation as to why the Foundation should be denied exemption are considerably broader, as has already been pointed out.

The Foundation filed income tax returns for years 1951 and 1952 and paid the following amounts for taxes for those years:

| | |
|---|---|
| August 3, 1953 | $35,212.13 |
| August 14, 1953 | 18,503.35 |
| February 10, 1954 | 1,073.83 |
| April 22, 1954 | 2,365.18 |

The Foundation filed timely claims for refund for the above amounts but in all instances the claims were disallowed.

6. For example, see Sections 23(o) (2), 23(q) (2), 26 U.S.C.A. §§ 23(o) (2), 23 (q) (2) (*deductions from individual and corporate gross income of gifts to charitable organizations*); Section 812(d), 26 U.S.C.A. § 812(d) (deduction from gross estate of bequests to charitable organizations); Section 1426(b), (8), 26 U.S. C.A. § 1426(b) (8) (exemption of charitable organizations from social security tax).

the only significant change seems to have been the addition of the restrictive clause denying tax relief if a "part of the net earnings" of the organization "inures to the benefit of any private shareholder or individual" or if a "substantial part of the activities * * * is carrying on propaganda, or otherwise attempting, to influence legislation." We are not concerned here with those limitations for it is conceded that factors of individual profit and influencing legislation are not present.

Section 101(6) contains the following words of long-standing use for tax-exemption purposes:

> "Corporations * * * organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes * * *."

While this language does not seem difficult on its face, its meaning has, nevertheless, given rise to considerable litigation. Some of this litigation has involved the scope of the words "religious, charitable, scientific, literary, or educational", and some the meaning of the words "organized and operated exclusively". It is this latter phrase which gives rise to one of the contentions in this proceeding.

Few cases involving interpretations of Section 101(6) or related provisions couched in similar terminology have ever reached the Supreme Court of the United States. Consequently, much emphasis has been placed upon decisions and opinions of the Circuit and District Courts and the Tax Court.

The Supreme Court has said generally that statutory provisions exempting from tax funds which are devoted to charity "were begotten from motives of public policy, and are not to be narrowly construed." Helvering v. Bliss, 1934, 293 U.S. 144, 151, 55 S.Ct. 17, 20, 79 L.Ed. 246. The Court has never retreated from that view. See Old Colony Trust Co. v. Commissioner of Internal Revenue, 1937, 301 U.S. 379, 57 S.Ct. 813, 81 L.Ed. 1169; United States v. Pleasants, 1939, 305 U.S. 357, 59 S.Ct. 281, 83 L.Ed. 217. The Court's express refusal to pass upon the

matter when argued in Better Business Bureau of Washington, D. C. v. United States, 1945, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67, cannot be taken as a retreat. The facts of that case made it wholly unnecessary for the Court to consider the point. The Circuit Courts, too, have usually applied the doctrine of liberality. Seasongood v. Commissioner of Internal Revenue, 6 Cir., 1955, 227 F.2d 907, 910; Arthur Jordan Foundation v. Commissioner of Internal Revenue, 7 Cir., 1954, 210 F.2d 885, 889; C. F. Mueller Co. v. Commissioner of Internal Revenue, 3 Cir., 1951, 190 F.2d 120, 122; Commissioner of Internal Revenue v. Citizens and Southern National Bank, 5 Cir., 1945, 147 F.2d 977, 979; Bohemian Gymnastic Association Sokol of City of New York v. Higgins, 2 Cir., 1945, 147 F.2d 774, 777; United States v. Proprietors of Social Law Library, 1 Cir., 1939, 102 F.2d 481, 482; Cochran v. Commissioner of Internal Revenue, 4 Cir., 1935, 78 F.2d 176, 179.

The meaning of the key words "organized and operated exclusively for" charitable purposes has been the subject of disagreement not only among litigants but also among the courts. As to "organized" the Supreme Court has given no direct light, but the better view, based in part upon the doctrine of liberality of construction respecting charitable exemptions which resolves ambiguities in favor of the taxpayer and in part upon a refusal to allow form to control over substance, is that "organized" means "created to perform" or "established to promote" charitable purposes rather than meaning merely "incorporated" with powers limited solely to charitable activities. In Commissioner of Internal Revenue v. Battle Creek, Inc., 5 Cir., 1942, 126 F.2d 405, 406 a sanitarium was held to be a charitable organization exempt from income tax under Section 101(6) although its charter gave the trustees power to conduct any lawful business. The Court observed that "It is not unusual for charters of corporations to grant broad powers and privileges that are never intended to be used."

Roche's Beach, Inc. v. Commissioner of Internal Revenue, 2 Cir., 1938, 96 F.2d 776 and Forest Press, Inc., v. Commissioner of Internal Revenue, 1954, 22 T.C. 265 are to the same effect. To grant or deny tax benefits to organizations upon a basis of recitations in a charter or certificate would not seem to accomplish what Congress was getting at. The issue of "organized," as this Court now conceives the law, is primarily a question of fact not to be determined merely by an examination of the certificate of incorporation but by the actual objects motivating the organization and the subsequent conduct of the organization. To some degree, "organized" cannot be divorced from "operated," for the true purposes of organization may well have to be drawn in final analysis from the manner in which the corporation has been operated.

With particular reference to "exclusively," the Supreme Court has twice given this word meaning as it appears in Section 101(6) and related sections. In Trinidad v. Sagrada Orden de Predicadores, 1924, 263 U.S. 578, 44 S.Ct. 204, 205, 68 L.Ed. 458, the Court was faced with the question as to whether the production of income prevented an organization from being operated exclusively for charitable purposes. The Court held that the carrying on of income-producing activities did not offend the limitation of "exclusively" so long as the activities were purely incidental to the principal charitable purposes to which the income was ultimately devoted. The Court's reasoning was that the exempting section itself recognized that a corporation might be organized and operated exclusively for charitable purposes and yet have an income; furthermore, the section said "nothing about the source of the income" but made the "destination" of income the "ultimate test of exemption." The or-

ganization held to be exempt in this case was religious, and the Court specifically approved income-producing investments in real estate, corporate stocks, loans at interest, occasional sales of stocks, and sales of wine, chocolate and other articles purchased and supplied for use in its churches, missions, schools and subordinate agencies. However, the Court suggested that the result might not be the same if the organization had been engaged in "a business pursuit" or "in trade in any proper sense of the term." The Court pointed out: "It is not claimed that there is any selling to the public or in competition with others. * * * That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed."

It is indeed hard to rationalize the divergent statements of the Court. Surely, if the "destination of income" is the "ultimate test of exemption", it would not seem to matter how the income is produced so long as it is eventually devoted to charitable purposes. The notion that engaging in business pursuits in competition with others might bring about denial of the exemption runs into a head-on conflict with the "ultimate destination" theory. The likely explanation is that there were members of the Court who foresaw the economic effect of permitting to tax-free organizations carte blanche entry into the competitive business area.[7] Certainly the opinion left serious doubts as to the adequacy of the statutory language.

The second occasion upon which the Supreme Court considered "exclusively" was in Better Business Bureau of Washington, D. C. v. United States, 1945, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67. That case involved Section 811(b) (8) of the Social Security Act, 49 Stat. 620, 639, 42

---

7. "Manifestly, a corporation engaged in commercial activities, if exempt from federal taxes, would have a tremendous economic advantage over competitors in the same field. Such a corporation could effectively eliminate competitors, actual and potential, since it could undersell cor-

porations, whose earnings are subject to diminution by federal taxation." United States v. Community Services, Inc., 4 Cir., 1951, 189 F.2d 421, 425, certiorari denied, 1952, 342 U.S. 932, 72 S.Ct. 375, 96 L.Ed. 694.

U.S.C. § 1011(b) (8), but it contains the same language as Section 101(6) from which it was undoubtedly drawn. Income-producing activity was not involved, the Better Business Bureau's exemption being opposed on the ground that its chief purpose was to promote business interests rather than education. In the course of its opinion, the Court expressed the view that "exclusively" plainly means without the presence of a single noncharitable purpose substantial in nature.

Thus, the Trinidad case was the only Supreme Court decision dealing with income-producing activity. Drawing from this case the rule that the fundamental or ultimate test of exemption is the destination of income, several of the Circuit Courts held organizations engaged in a wide variety of income-producing activities to be within the exempting language. Furthermore, it was held that it made no difference that the organization did not itself perform any charitable services so long as the income was used for such purposes. The latter type of organization, which merely produced and paid over income to some charitable organization, came to be frequently referred to as a "feeder". The value of this term is questionable.[8]

A few of the decisions will indicate the extent to which the ultimate destination test has been applied in holding organizations exempt from income tax under Section 101(6). Roche's Beach, Inc., v. Commissioner of Internal Revenue, 2 Cir., 1938, 96 F.2d 776 (corporation operating bathing beach; income was turned over to a charitable foundation); Debs Memorial Radio Fund, Inc., v. Commissioner of Internal Revenue, 2 Cir., 1945, 148 F.2d 948 (corporation operated commercial radio station; income used for broadcast of educational, civic and cultural programs); Commissioner of Internal Revenue v. Orton, 6 Cir., 1949, 173 F.2d 483 (foundation engaged in the manufacture of standard pyrometric cones; income devoted to study and research in the field of ceramics); Willingham v. Home Oil Mill, 5 Cir., 1950, 181 F.2d 9, certiorari denied, 1950, 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (corporation engaged in oil business; income paid over to charitable organizations); C. F. Mueller Co. v. Commissioner of Internal Revenue, 3 Cir., 1951, 190 F.2d 120 (corporation engaged in the manufacture and sale of macaroni and allied products; income paid over to educational institution).

On the other hand, some courts refused to read the Trinidad opinion to the same effect and concluded that Congress could never have intended to accord tax exempt.

8. There seems to be a tendency in cases such as the one before this Court to seize upon the rather alluring term of "feeder," to classify an organization with relation thereto, and to attempt to determine the tax consequences on that basis. This tendency has been accentuated by an erroneous notion that the decisions of certain courts and the provisions of the Revenue Act of 1950 are predicated on such categorization. Often it is not made clear whether the label was applied to a particular organization because it did not perform any charitable services itself but merely contributed funds to charities which did, or because the organization was engaged in some commercial venture, or because both factors were present. The term apparently was first applied to an organization which combined both of the features. Roche's Beach, Inc., v. Commissioner of Internal Revenue, 2 Cir., 1938, 96 F.2d 776, 778. Suppose an organization derives its income solely from dividends and interest on securities, which income is then paid over to an exempt charity. Is it any the less a "feeder" because its income was not derived from a business venture? Yet the term never seems to have been applied to a charitable trust or foundation which did no more than invest its funds and distribute the income to some charity. Suppose the income were distributed not to one but to several charities. How would the organization be classified if it also rendered charitable services itself?

Perhaps the amendments effected by the Revenue Act of 1950 will discourage further use of the term "feeder", as the imposition of tax upon certain income irrespective of its ultimate charitable destination is not dependent upon the classification of an organization as a "feeder" or otherwise.

status to a corporation, regardless of its own activities, merely because its profits were used for charitable purposes. Bear Gulch Water Co. v. Commissioner of Internal Revenue, 9 Cir., 1941, 116 F.2d 975 (water company whose stock was held by a university which received and used the income for educational purposes); United States v. Community Services, 4 Cir., 1951, 189 F.2d 421, certiorari denied 1952, 342 U.S. 932, 72 S. Ct. 375, 96 L.Ed. 694 (corporation operated canteen refreshment service and other commercial enterprises, sales being limited to employees of a certain company; income turned over to charitable organizations); Ralph H. Eaton Foundation v. Commissioner of Internal Revenue, 9 Cir., 1955, 219 F.2d 527 (foundation engaged in various commercial and business enterprises; income paid to charitable organizations); John Danz Charitable Trust v. Commissioner of Internal Revenue, 9 Cir., 1956, 231 F.2d 673 (trust bought and sold stocks, operated a hotel and candy stores; distributions made to charitable organizations).

Although the application of the ultimate destination test by the Circuit Courts was called to the attention of Congress in 1942, no amendment was made pending further study. C. F. Mueller Co. v. Commissioner of Internal Revenue, 3 Cir., 1951, 190 F.2d 120, 122 note 5. It was not until 1950 that Congress made any change in the provisions of Section 101(6) and related sections.

The exemption from tax of business corporations paying over income to charity and charitable organizations themselves engaged in commercial ventures not related to their charitable purposes was not the only problem of consequence flowing from the provisions of Section 101(6) and related sections. The study of exempt organizations during the 1940s brought to light other matters which had never been the subject of litigation under the exempting provision. The picture presented to members of Congress in 1950 not only included this broad application of the doctrine of destination as the ultimate test of exemption and its effect on competition, but also revealed among other things that in some instances (a) exempt organizations had made investments in real property through the incurring of substantial indebtedness and lease-back transactions not requiring the use of any funds of the exempt organization; [9] (b) exempt organizations were using or distributing little or none of their income for current charitable purposes, but were amassing vast amounts of money without any apparent limitation; (c) creators of charitable foundations retained a control which enabled them to use and manipulate the foundation funds to their own personal financial advantage; and (d) certain charitable trusts were established for the principal purpose of operating family controlled businesses to effectively avoid various taxes otherwise due.[10]

To remedy the foregoing the Revenue Act of 1950 clarified and changed the existing law respecting charitable organizations in five major respects. Roughly, the amendments were these:

(1) a tax was imposed on rentals from property leased by charitable organizations to others on a long-term basis where the property was purchased with borrowed funds;

(2) a paragraph was added to Section 101 which eliminated tax exemption for business corporations devoting income to charity (for text see footnote 4);

9. Such transactions were built around the freedom from tax on rents received by the charitable organization, which rents were applied to the indebtedness incurred. No doubt a charitable organization was able to pay a higher purchase price under these circumstances than other purchasers. Should this become a widespread practice, an unlimited amount of property might be acquired by exempt organizations, bringing about not only a loss of income tax revenues but also a loss of local taxes.

10. Sen.Rep. No. 2375, 81st Cong. 2d Sess., U.S.Code Cong. Serv. (1950) 3053, 3078–3092.

(3) a tax was imposed on net income in excess of $1,000 derived by any organization within Section 101(6) from business activities not related to the purposes for which exemption was granted to the organization;

(4) a new Section 3813 was added denying exemption to organizations which engage in any of a number of specific "prohibited transactions" with creators or donors or corporations controlled by such persons; however, certain organizations were specifically exempted from the application of this section (see footnote 1); and

(5) a new Section 3814 was added denying exemption for the particular tax year involved to any Section 101(6) organization which unreasonably accumulate income, use income to a substantial degree for purposes other than those constituting the basis of exemption, or invest income in such manner as to jeopardize the carrying out of those purposes; again, however, certain organizations were specifically exempted from the application of this section (see footnote 1).

With the foregoing background of fact and law, the questions posed by this litigation may be considered

I. Is The Foundation Exempt From Income Tax Under Section 101?

It would seem that the Foundation was created and operated to promote medical care, education and research. That such purposes are charitable, educational or scientific within the meaning of Section 101(6) is not disputed by the Government. However, the Government contends that because of the powers and activities of the trustees of the Foundation respecting financial matters the Foundation was not organized and operated *exclusively* for charitable purposes in the sense required by Section 101(6) and, furthermore, the financial activities caused it to be "operated for the primary purpose of carrying on a trade or business for profit" within the meanmg of the amendment to Section 101 made by

the Revenue Act of 150 set forth in footnote 4.

While the powers given to the trustees in the certificate of incorporation in respect of investments may be broad, as already pointed out the certificate provisions are not determinative of whether an organization meets the requirements of Section 101.

Upon analysis, the financial activities of the Foundation during the years 1951 and 1952, apart from the receipt of contributions and the distribution of funds to charitable organizations, consisted only of investing in stocks, debentures and mortgages on real and personal property.

 · The investment of funds of a charitable organization in securities has never been conceived of as a "purpose" of the organization. It has always been treated as an incidental activity subservient to the fundamental charitable objects. It is safe to say that the vast majority of charitable organizations and trusts in this country today have funds invested in stocks, bonds, mortgages, or real property not merely for safekeeping but for earning income. In many cases these investments provide the very lifeblood of the charitable work carried on or supported. If any authority is needed that such investments are incidental to the purposes of a charity it will readily be found in the Supreme Court's decision in the Trinidad case already discussed. In that case, approximately 35% of income was derived from rents and 59% from dividends and interest on investments. The Court observed [263 U.S. 578, 44 S.Ct. 205]:

"Such [charitable] activities cannot be carried on without money; and it is common knowledge that they are largely carried on with income received from properties dedicated to their pursuit. This is particularly true of many charitable, scientific and educational corporations and is measurably true of some religious corporations. Making such properties productive to the end that

the income may be thus used does not alter or enlarge the purposes for which the corporation is created and conducted."

As noted in the Trinidad case, Section 101(6) clearly recognizes that charitable organizations may have income, and it is hard to conceive of a more passive way to acquire income than through investment in securities. Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939 and amended to embrace changes made by the Revenue Act of 1950, expressly state in Section 29.101(6)–1

"A corporation otherwise exempt under section 101(6) does not lose its status as an exempt corporation by receiving income such as rent, dividends, and interest from investments, provided such income is devoted exclusively to one or more of the purposes specified in that section."

The investment and security transactions of the Foundation during the years 1951 and 1952 consisted of the following:

| Purchases | Sales | Item |
| --- | --- | --- |
| March 1951 | — | $75,000 Jackson County V. A. Construction Mortgage |
| May 1951 | (satisfied by prepayment in 1952) | $805,000 Casablanca Hotel Mortgage |
| May 1951 | October 1951 | $403,000 Casablanca Hotel Conditional Sales Notes |
| May 1951 | — | 55,000 shares Food Fair Stores, Inc. Common Stock |
| (Contribution) | May 1951 | 120,000 shares Official Films, Inc. Common Stock |
| June 1951 | — | $1,000 Miami Jewish Center Debenture |
| (Contribution) | October 1951 | 2,000 shares Food Fair Stores, Inc. Common Stock |
| June 1951 | — | 500 shares Food Fair Stores, Inc. Common Stock |
| February 1952 | April 1952 | $100,000 Sun Tan and Palm Vel Buildings Mortgage |
| October 1952 | — | $17,500 Dwelling Mortgage |

The argument of the Government that the investment activities of the Foundation during the years involved bring it within the category of "An organization operated for the primary purpose of carrying on a trade or business for profit" seems clearly untenable. In the first place, the investment of funds could under no circumstances be reasonably considered as the primary purpose of the Foundation. In the second place, what investment activity there was fell far short of anything that might be properly characterized as trade or business. It was occasional, isolated and sporadic—investments apparently were made only when some particularly favorable but unusual opportunity or occasion arose which motivated the trustees to act. Any view of the Foundation as a mere cloak for the amassing of funds not intended for charitable use is at complete odds with the facts before this Court, a great many of which were stipulated before trial.

It is true that the Foundation borrowed money in order to be able to make several of the investments listed above, but it is hard to see how such fact alone would render the transactions any more in the nature of a trade or business, inasmuch as it was merely a means of carrying out those transactions. In any case, it was not a policy of the Foundation to incur indebtedness in connection with its investments. The borrowing engaged in during 1951 and 1952 was merely an instrument designed to assist the Foundation in building up an initial fund to be devoted to charitable work. Establishing an initial fund may, however, involve an accumulation of income. The effect of any such accumulation upon the exempt

status of the Foundation will be discussed under III below.

■■ In summary, it may be said that so far as Section 101 is concerned the Foundation is a charitable organization exempt from income tax. Certainly there was no question of this before the Revenue Act of 1950, and the Commissioner so ruled. As to the 1950 Act, its purpose was to deny a tax exempt status to business corporations which, by virtue of the decisions of certain of the Circuit Courts, had been held to come within Section 101 for the reason that the ultimate destination of income was charity. The amendment was not intended to and does not apply to organizations which meet the tests of Section 101 and merely invest funds in securities, the income being used to advance charitable objects. In fact, it would seem that Sections 421 and 422, 26 U.S.C.A. §§ 421, 422, imposing an income tax upon the unrelated trade and business of an otherwise exempt charitable corporation, would be the appropriate sections under which the Government's argument should be made. But since the occasional investment activity of the Foundation here involved does not in any case amount to a trade or business, the result would be no different.

II. Is The Foundation, Within The Meaning Of Section 3813, "An Organization The Principal Purposes Or Functions Of Which Are The Providing Of Medical Or Hospital Care Or Medical Education Or Medical Research"?

■ Sections 3813 and 3814 exclude five categories of charitable organizations from their operation. The pertinent language has been set forth in footnote 1. A reading of the provision in the light of the background of the amendments of 1950 makes it very clear that the organizations which Congress was exempting from the effects that would otherwise follow from prohibited transactions and proscribed accumulation and use of income were those organizations as to which it was very unlikely that such transactions or activities would occur.

In the main, the organizations excluded might be described as charities having direct relations with the public. The basis for their exclusion may be readily surmised. On the one hand, such organizations are generally in need of all available funds to carry on their work, the extent of which is often bounded only by that availability, and hence it is unlikely that these organizations would accumulate or divert income. On the other hand, public scrutiny which is apt to occur in the course of their operations would discourage conduct at which the amendments were aimed.

In the field of medical charity, the organizations that naturally fall within the area mentioned are hospitals, clinics and the like, medical schools, and medical research centers and laboratories. Thus, the exclusionary language of Section 3813 contains the following descriptive clause:

"(5) an organization the principal purposes or functions of which are the providing of medical or hospital care or medical education or medical research."

Clearly, a distinction is made by this provision between the organization which directly dispenses charity or engages in performing services or work in medical research and education and the organization which merely donates money to support the work of such an organization. Congress intended the former to be excluded from Sections 3813 and 3814 but not the latter, for the reasons already given.

■ The Foundation involved in this case appears to be just the type of nonpublic organization towards which the restrictions and limitations established by Sections 3813 and 3814 were directed by Congress. The Foundation contends that the excluding language of Section 3813 should be given a broader interpretation. To do so would be to disregard the patent intent of Congress and seriously thwart remedial legislation.

It may be noted that the Commissioner has ruled that "a charitable foundation

whose primary purposes and functions consist of making distributions to tax-exempt hospitals and medical research organizations, but which as its primary activity does not actually perform the activities generally engaged in by such organizations, is not engaged in providing medical or hospital care within the meaning of section 3813(a) (5) of the Internal Revenue Code and is, therefore, subject to the provisions of Section 3814 of the Code relating to accumulation of income." Rev.Rul. 54-137 (CB 1954-1, :289).

The Foundation's contention is grounded largely upon the stated purpose provision of its certificate of incorporation. After the passage of the Revenue Act of 1950 the Foundation amended its certificate so as to set forth its purposes in the very language of Section 3813(a) (5). But this was of no avail since there is a difference in the meaning of the language as employed by Congress and as used by the Foundation. As used by Congress, the language is not descriptive of the actual purpose and operation of the Foundation.

III. Within The Meaning Of Section 3814, Were Any Amounts Accumulated By The Foundation Out Of Income

(a) Unreasonable In Amount?

The facts pertinent to accumulations out of income are these: In 1950, the first year of operation of the Foundation, income received from dividends and interest amounted to $9,341.11 and from capital gains $9,818.94, or a total of $19,160.05. Deducting the expenses of operation for that year leaves a net of $19,111.68. Distribution during that year amounted to $8,340.00 to charitable organizations. In 1951 the Foundation received dividends and interest of $44,-622.50 and capital gains of $54,504.87, or a total of $99,137.37. Deducting expenses of operation leaves $94,416.01. During 1951 distributions totalling $19,-445 were made to a dozen charities. In 1952, dividends and interest were $64,-156.18 and capital gains $146,000, or a

total of $210,156.18. Expenses reduced the net to $184,903.78. At the same time, the Foundation distributed $22,154 to sixteen charities.

Section 3814 deals with "amounts accumulated out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year". The statute does not define the term "accumulated" nor the word "income". The Treasury has, however, issued a regulation to implement Section 3814. This regulation reads in part:

"For the purpose of section 3814 the term 'income' means gains, profits, and income determined under the principles applicable in determining the earnings or profits of. a corporation. The amount accumulated out of income during the taxable year or any prior taxable year shall be determined under the principles applicable in determining the accumulated earnings or profits of a corporation." Treasury Regulation 111, Section 29.3814–1.

Congress not having indicated that any special meaning should be given to the terms mentioned, it would seem appropriate to give them the common meaning indicated in the regulation.

What, then, are the amounts accumulated out of income by the Foundation from the commencement of its operation until the end of 1952? The amounts appear to be as follows:

| | |
|---|---|
| 1950 | $10,771.68 |
| 1951 | 74,971.01 |
| 1952 | 102,749.78 |

These amounts are arrived at by deducting from net income the distributions made to charitable organizations in each year.

Turning now to the first subdivision of Section 3814, the issue is whether the amounts accumulated by the end of 1951 or the end of 1952

"are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose

or function constituting the basis for such organization's exemption under section 101(6)".

The section gives no suggestion as to particular factors to be taken into account in determining reasonableness of amount. The regulation just referred to, issued to implement the section, reads in part as follows:

"Amounts accumulated out of income become unreasonable when more income is accumulated than is needed, or when the duration of the accumulation is longer than is needed, in order to carry out the purpose constituting the basis for the organization's exemption."

This is not very enlightening, but it can be appreciated that when the standard involved is one of reasonableness it may only court disaster to attempt to elaborate thereon, for the number and nature of the factors likely to be present in specific cases can hardly be predicted. The regulation goes on to make two rather sound observations as to capital gains insofar as the reasonableness of accumulation is concerned:

"The amount accumulated out of income during the taxable year or any prior taxable year shall be determined under the principles applicable in determining the accumulated earnings or profits of a corporation. In determining the reasonableness of an accumulation out of income, there will be disregarded the following: (1) The accumulation of gain upon the sale or exchange of a donated asset to the extent that such gain represents the excess of the fair market value of such asset when acquired by the organization over its substituted basis in the hands of the organization; (2) the accumulation of gain upon the sale or exchange of property held for the production of investment income such as dividends, interest, and rents, where the proceeds of such sale or exchange are within a reasonable time reinvested in property acquired and held in good faith for the production of investment income."

Were any course other than that mentioned in (2) above pursued, a serious hardship might be worked upon a charitable organization which desired to make a change in its portfolio involving the sale of an appreciated investment and the reinvestment of the proceeds.

Without actually tracing the disposition of capital gains by the Foundation, it seems clear that the amounts so acquired by the Foundation up to the end of 1952 must be considered as having been reinvested, especially in view of the fact that the Foundation, not having sufficient funds of its own for investment purposes, borrowed various sums during those years in order to take advantage of investment opportunities. Consequently, the amounts accumulated must be reduced by the amount of the capital gains insofar as the first subdivision of Section 3814 is concerned. This cannot be done with complete precision as the evidence is not sufficiently detailed so as to permit an allocation of expenses of operation between the production of income in the form of dividends and interest on the one hand and capital gains on the other. Roughly, the amounts accumulated, excluding capital gains, are as follows: $1,000 in 1950; $20,000 in 1951; and $18,000 in 1952.

The matter would seem to be reduced to the question whether the $21,000 accumulation at the end of 1951 or the $39,000 accumulation at the end of 1952 was unreasonable. But the dollar amount of accumulation cannot really be the test that the section was designed to impose. What the true test appears to be is this,—Does the charitable organization have a concrete program for the accumulation of income which will be devoted to a charitable purpose and in the light of existing circumstances is the program a reasonable one?

The answer to this question depends upon several factors. In this case, it cannot be doubted that the Foundation had a definite program and char-

itable object for accumulation. While perhaps no formula is devisable to determine reasonableness in all cases, the factors to be considered here seem to be

(a) Purpose of accumulation and dollar goal—The Foundation desired to raise $500,000 to be donated to Brandeis University for the construction of a medical research center.

(b) Funds available at starting point to be devoted to accumulation —At the time of the adoption of its program to accumulate a half-million dollars, the net worth of the Foundation was approximately $50,000.00.

(c) Likelihood of funds becoming available from contributions to be added to accumulation to reach dollar goal—Under the facts as found, it must be assumed that the Foundation would receive $50,000 a year in contributions from Mr. Friedland and Hasaam Realty Corp. The prospect of other contributions was not sufficient to warrant consideration.

(d) Extent of time required to reach dollar goal—Unless the Foundation sustained a loss through investment or circumstances changed markedly, it would clearly appear that $500,000 would be accumulated in eight years, even if the Foundation continued its practice of making some annual charitable contributions. This estimate does not take into account the possibility of capital gains, which ought not to be entirely disregarded if the prognostication is to be geared to the reality of the circumstances. Hence, six or seven years would seem to be a fairly conservative estimate of the accumulation period.

In view of the above factors, it would be hard to say that the program adopted by the Foundation is an unreasonable one. The retention of income by a charitable organization for six, seven or even eight years pursuant to a project to provide an established educational institution with a medical research building is certainly of equal if not greater benefit to the public than requiring the distribution in each taxable year of income received by that organization. And it follows that if the program is reasonable no amount of accumulation out of income short of the dollar goal can offend the statutory provision; in fact, the greater the accumulation the more rapidly the public benefit will accrue.

The conclusion must be that the Foundation did not engage in unreasonable accumulation out of income in the taxable years 1951 and 1952.

(b) Or Used To A Substantial Degree For Non-Charitable Purposes?

If there was any use of amounts accumulated out of income for non-charitable purposes, it does not appear from the facts before this Court. To the extent that amounts so accumulated were used by the Foundation it was for investment purposes. The role which investments bear to the operation of a charitable organization and more particularly to this Foundation has already been touched upon to a sufficient extent to indicate that the investment activity of the Foundation was not a non-charitable purpose, but was incidental and promotive of its charitable purposes.

(c) Or Invested In Such A Manner As To Jeopardize The Charitable Purpose Or Function Of The Foundation?

Amounts accumulated out of income were invested by the Foundation in the securities listed in I above. The Government contends that thereby the charitable purpose of the Foundation was jeopardized.

It is true, as the Government says, that the "investment by the taxpayer in the aforementioned mortgages and securities is not the type of investment usually found in the portfolio of trust funds." But that is quite different from saying that these investments jeopardized the charitable purpose of the Foundation. The test of the third subdivision of Section 3814 seems to be not whether any one or two investments made with accumulated income were like-

# 94

ly to founder, but whether whatever loss was apt to occur would imperil the capability of the organization to carry out its charitable purposes.

The Government introduced no evidence, either expert or otherwise, that the Foundation's investment of accumulated income would threaten the rendering of the charitable benefits sought to be advanced by Section 101.

The minor investments may be disregarded, as even a total loss would have no substantial adverse effect upon the continued operation of the Foundation and the promotion of its purposes. The major investments, in connection with which accumulated income was presumably used, included the Park Central Hotel Second Mortgage, the Casablanca Hotel Third Mortgage and Notes, the Jackson County Veterans' Administration Construction Mortgages, the Sun Tan and Palm Vel Buildings Mortgage, and the 55,000 shares of Food Fair Stores, Inc. Common Stock. As to the mortgages and notes, the facts do not indicate anything inherently risky about these investments. The value of the property which secured the obligations appears in each case to have been substantially in excess of the amount of the indebtedness. The fact that the mortgages were second or third mortgages is not controlling in view of the limited amounts of the prior mortgages in relation to the value of the property pledged.

The purchase of the common stock of Food Fair Stores, Inc., in May, 1951, requires a more detailed consideration. The purchase price of the Food Fair stock was $1,100,000.00. To effect the transaction, the Foundation borrowed $800,000 from Mr. Friedland and $300,000 from the Philadelphia National Bank, subsequently borrowing an additional sum from the bank to repay Mr. Friedland's loan in part. Although the entire purchase price was borrowed, it is fair to assume that somewhere along the line income accumulated in the tax years here involved was used by the Foundation towards this investment. Under the third subdivision of Section 3814, this

would appear to be enough to bring the provision into play as respects the totality of the investment. Did this investment imperil the charitable function of the Foundation? At the time the investment was made the Foundation had a net worth of about $110,000. The stock purchased was selling on the market at between $20.00 and $21.00 per share, the 55,000 shares being acquired by the Foundation at $20.00 per share. A decline in the market of 3 points could have wiped out the Foundation. The question then becomes, what was the likelihood of such an occurrence?

The only testimony on this point was provided by Mr. Friedland whose personal intimate knowledge of Food Fair and whose general investment acumen is unquestioned. In Mr. Friedland's opinion, upon the basis of which the investment was made, it was very unlikely that Food Fair stock would decline at all; in fact from his inside position he was completely confident that short of a substantial reverse in the entire market the price of Food Fair stock would rise.

According to Mr. Friedland

"Food Fair Stores has been expanding since 1936 right along, and at that time [May 1951] we knew our expansion program was set. The Company had good finances and we were going ahead on a great expansion * * * "

It cannot be forgotten that if the Foundation was wiped out Mr. Friedland would have suffered a consequential personal financial loss inasmuch as a considerable portion of the borrowed money used by the Foundation in the acquisition of the investment was loaned by Mr. Friedland and Hasaam Realty Corp.

 The evidence will not support a conclusion that investments made by the Foundation with the use of accumulated income jeopardized its charitable purpose or function.

In summary, during the taxable years 1951 and 1952, the Foundation was exempt from income tax under Section 101 and did not lose its exemption by reason

of the provisions of Section 3814. Consequently, the Foundation is entitled to recover the amount of the income taxes paid for the taxable years 1951 and 1952, together with interest thereon.

This opinion shall be deemed to embody the Court's findings of fact and conclusions of law. An appropriate order for judgment may be submitted.