A. A. Allen Revivals, Inc. v. Commissioner.
A. A. Allen Revivals, Inc. v. Commissioner
Docket No. 1870-62.
United States Tax Court
T.C. Memo 1963-281; 1963 Tax Ct. Memo LEXIS 65; 22 T.C.M. (CCH) 1435; T.C.M. (RIA) 63281; October 11, 1963
Wentworth T. Durant, Fidelity Union Tower, Dallas, Tex., Ronald M. Mankoff, and Robert E. Davis, for the petitioner. Roy E. Graham, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's income taxes for the taxable years ended May 31, 1958, and May 31, 1959, in the respective amounts of $74,212.58 and $247,331.07. The sole issue for decision is whether during these years the petitioner was exempt under section 501(c)(3), Internal Revenue Code *66 of 1954, as a corporation organized and operated exclusively for religious and educational purposes with no part of its net earnings inuring to the benefit of any private shareholder or individual. Findings of Fact Many of the facts have been stipulated and are so found. A. A. Allen Revivals, Inc., (hereinafter referred to as the petitioner) was incorporated under the laws of the State of Texas on June 4, 1957. It has been and is now duly licensed as a foreign corporation in the State of Arizona, having its principal office at Miracle Valley, Arizona. At all times since its incorporation the petitioner has kept its financial books and records on a fiscal year basis ending May 31. The petitioner filed no corporate income tax return for the fiscal year ended May 31, 1958, because it was thought to be exempt from income tax under section 501(c)(3) of the Internal Revenue Code of 1954. On November 17, 1959, the petitioner filed for the fiscal year ended May 31, 1959, its corporation income tax return with the district director of internal revenue at Dallas, Texas. On January 3, 1961, an amended corporation income tax return for the taxable year ended May 31, 1959, was *67 filed. Petitioner received its original assets by assignment from A. A. Allen Revivals, Inc., an Oregon corporation which was organized prior to 1952, in consideration of petitioner's agreement to assume all of the liabilities of the Oregon corporation. At the close of the fiscal years ended May 31, 1958, and May 31, 1959, the petitioner had total assets of $476,314.65 and $782,353.40, respectively, and total liabilities and reserves of $261,799.98 and $302,957.02. The petitioner also had "contributed" surplus of $100,766.32 and $365,648.03 for the same years. A. A. Allen Revivals, Inc., the Oregon corporation, had received a ruling acknowledging its tax exempt status from the Exempt Organizations Branch of the Internal Revenue Service in 1952, but this ruling was revoked on October 5, 1960. Petitioner requested a determination of its exempt status by filing Form 1023 (Exemption Application) with the district director of internal revenue at Dallas on November 19, 1958. This application as to exempt status was denied by the Exempt Organizations Branch of the Internal Revenue Service by letter dated October 5, 1960. The purposes for which the petitioner was organized are stated *68 in its Charter as follows: 1. To support and maintain all benevolent, charitable, educational or missionary undertakings of the Corporation. 2. To obey in our capacity as a Christian church organization the Great Commission as stated in the Holy Bible, Matthew 28:18-20; Mark 16:15-20; Acts 1:8; teaching and practicing the time honored doctrines of the Christian Faith, as: Salvation for the soul of man through Jesus Christ (Mark 16:16); and Divine Healing, Mark 6:13; 11:22-26, James 5; 14-16. 3. To establish and maintain and use such departments, institutions, installations, media, equipment and policies as may be considered advisable and necessary for the pursuance, furtherance and maintenance of a traveling evangelistic institution and church. The petitioner has the following powers under its Articles of Incorporation: 1. To contract and be contracted with; 2. To have and to use a corporate seal, and the same to change at pleasure. 3. To purchase, receive, possess, and dispose of such real and personal property, as may be necessary or convenient to carry out the object and purpose of said Corporation; 4. To receive and dispurse tithes, offerings, contributions, requests, *69 in a manner consistent with its purposes, and for the accomplishment of said purposes; 5. To own, hold, maintain, operate, lease, encumber, sell, exchange, and to otherwise acquire by will, gift or tithes and to dispose of, manage, or deal, with or in property of every kind and nature, both real and personal, and whether situated in the United States or any foreign country, to such extent as may be necessary or convenient in the object and furtherance of the objects and purposes of this Corporation; 6. To establish, maintain and conduct radio and/or television broadcasting stations and other media for dissimination of knowledge, and for such other purposes as may benefit the Corporation; 7. To establish, maintain and conduct schools for religious instruction and education; 8. To publish and distribute religious literature; 9. To engage in other related ministries for the preaching of the gospel of Jesus Christ; as commanded in the Great Commission. (Matthew 28:19-20; Mark 16:15-18) by means of television, radio, publications, and any means whatsoever; 10. To work in cooperation of all believers who desire the literal fulfillment of Christ's prayer, "that they all might *70 be one," while maintaining scriptural sovereignty under God, to fulfill its purposes according to the dictates of its own conscience, without affiliation, active, passive or implied, with any other ecclesiastical body, and without amenibility to any other religious organization; 11. To make By-Laws, not inconsistent with any existing law, nor any provision of these Articles of Incorporation, for the governing of its affairs and the management of its property; and; 12. To do any and all powers which now or hereafter may be permitted by law for corporations of this character. The Articles of Incorporation also provide that the petitioner is not to be affiliated actively, passively, or impliedly, with any other religious organization. Articles III and VIII provide that the existence of the petitioner is limited to 50 years, but upon its liquidation, dissolution, or abandonment, its property shall be distributed to such religious and charitable uses as the board of directors shall adjudge right and proper. Petitioner's property is irrevocably dedicated to religious and charitable purposes. The original incorporators of petitioner were A. A. Allen, Lexie E. Allen, his wife, and Robert *71 W. Schambach. Now, however, there are nine members of the board of directors, two of whom are the Allens. A. A. Allen was ordained a minister by the Assembly of God. He relinquished his credentials as a minister of that Order in 1956. Petitioner's present administration building is located at Miracle Valley, Arizona. By June 1959, the following buildings had been erected on property owned by petitioner at Miracle Valley: a ranch house, a trailer park, a cafeteria, a shop building, two school buildings, a small chapel, and two dormitories. After June 1959, the petitioner erected its administration building and church building at Miracle Valley. All of these are owned and operated by petitioner. Prior to September 1959, the petitioner's headquarters were in Dallas, Texas, but in that month they were moved to Miracle Valley. During 1958 and 1959 devotional services were conducted every morning in the Dallas office of petitioner, either by the office manager or by some other member of the office staff. At Miracle Valley petitioner conducts two Sunday services in the church, two mid-week services on Tuesday and Friday nights. It also conducts devotional services for all its employees *72 on Monday, Wednesday, and Friday. During the years in issue the petitioner maintained and operated at Miracle Valley an elementary school, a high school, and a Bible school, all of which were open to students from any part of the world. Petitioner conducted religious revival services in various parts of the United States at frequent intervals. These services were held primarily in a large tent owned by petitioner which has a seating capacity of about 10,000 people. Other services, however, were held in public auditoriums and in churches. In addition, the petitioner periodically conducted evangelistic campaigns in various parts of the world outside the territorial limits of the United States. Petitioner concurrently conducted church and religious programs on radio and television stations in many parts of the United States and over foreign stations. It purchased and paid for regular time for these programs with its own funds. All of its religious services are conducted by and under the direction of petitioner's officers, who have been ordained and accredited as ministers by Miracle Revival Fellowship, Inc., a nonprofit Minnesota corporation organized in September 1956. One of *73 the purposes for which Miracle Revival Fellowship, Inc., was formed was to "assist the ministry in procuring credentials as license or certificates of ordination, through the channels of the local sovereign church body." A second and succeeding corporation bearing the name "Miracle Revival Fellowship, Inc.," was organized as a nonprofit Texas corporation on or about February 1, 1958, for the same purpose. Petitioner has a published doctrinal statement representing the profession of faith to which both it and its adherents subscribe. It reads as follows: 1. We believe the Scriptures of the Old and New Testaments to be verbally inspired by God, and that they are the supreme and final authority in faith and conduct. 2 Peter 1:20-21; 2 Tim. 3:16. 2. We believe that Jesus Christ was begotten of the Holy Ghost, born of a virgin, and true God and true man; that there is no other name under heaven whereby men must be saved; and that as Christians, we are obliged to make this truth known. Matt. 1:20; Luke 1:30-33; Acts 4:12; Acts 22:15; Matt. 28:19. 3. We believe the Lord Jesus Christ died for our sins according to the Scriptures; that He rose again from the dead on the *74 third day, after which He was seen by many witnesses; that He then ascended into heaven, where He is now alive, and is our great High Priest, and advocate with the Father. We believe that because He has thus conquered death for us, we too shall be delivered from death. Matt. 24:30-31; 1 John 2:1, Mark 16:4-6, 19; Hebrews 5:5-6; Luke 24:6-8. 4. We believe in bodily resurrection of the just and the unjust; the just to everlasting rewards and the unjust to everlasting conscious suffering. Daniel 12:2; Rev. 20:1-15. 5. We look for the appearing of the Lord Jesus Christ in the clouds to catch away those who are prepared at His coming. Acts 1:9-11; 1 Thess. 4:13-18. 6. We believe that all believers are commanded to be filled with the Holy Spirit, and that the initial physical evidence of this infilling is the same as that received by the believers at Pentecost, the speaking of an unlearned language. We believe that this experience should be the beginning of a life of ever-increasing power for testimony and service. Acts 1:8; Acts 2:4; Matt. 16:17; Acts 19:6; 1 Cor. 14:21; lsa. 28:11; Matt. 3:11. 7. We believe in personal holiness, without which no man *75 shall see God. Hebrews 12: 13; 1 Thess. 3:1-25 and 4:7. 8. We believe in one triune Cod, eternally existent in three persons, Father, Son, and Holy Spirit. 1 John 5:7; Cor. 8:6; John 1:1-14; Matt. 28:19. 9. We believe that the faith of all true Christians will be expressed in loving service to God and our fellowmen. Eph. 6:5-7. 10. We believe that as true Christians center their affections upon our Lord and stand firmly for the essential doctrine that Jesus Christ, the Son of God, came in the flesh, died for our sins, and rose again, petty differences will vanish and we shall all "be one". John 17:21; 1 Cor. 12:1. 11. We believe that God still works MIRACLES: that the coming of the Lord to receive His Bride, the church, awaits the fulfillment of Matt. 24:14 - the preaching of the gospel with power and demonstration of the Holy Ghost in every nation for a witness. James 5:13-15; Mark 16:17-18; Acts 28:3-6. 12. We believe that next to the command to love God with the whole heart, mind, and soul, the greatest commandment of our Lord is loving fellowship between believers, excluding jealousy and hatred. Matt. 32:37-39; John 15:12; Galatians 5:14; Matt. *76 24:14. 13. We believe that God "hath made of one blood all nations of men for to dwell on all the face of the earth." Acts 17:26. The revival services carried on by petitioner in its field operation are conducted as regular church services. Included in the services are congregational singing, group singing, and singing of solos; prayers are conducted for the congregation and for the sick; the ministers conducting the service preach to the congregation; and offerings are taken to defray the expense of petitioner's revival campaigns. Baptismal services are customarily conducted at the field revival meetings and occasionally weddings. The field campaigns ordinarily last from 3 weeks to a month. Three services are held each day. These field campaigns are usually conducted at the requests of local ministers. Evangelistic campaigns conducted by petitioner outside the United States are similar to those conducted in field campaigns within the United States. Petitioner had certain sources of income during the years in issue. Among these were: 1. Contributions, offerings, and pledges received from its religious services in auditoriums, churches, in its tent, and by mail, totaling approximately *77 $1,006,444.29 for the fiscal year 1958 and $1,166,212.28 for the fiscal year 1959. 2. Sales of religious books and pamphlets written by Reverend A. A. Allen and others in the respective amounts of $66,070.47 and $97,283.69. The copyrights on these publications were retained by A. A. Allen personally since they were written before petitioner's incorporation. But petitioner did receive all the profits therefrom. 3. Income from its monthly publication known as Miracle Magazine. For these years the petitioner had magazine sales totaling $55,416.80 and $75,288.21. Petitioner had 35 persons who were employed in writing, editing, and publishing the magazine. Advertising in the magazine was solicited. This publication is devoted to "miraculous healing" and many of the articles and photographs depict the "miracles" claimed to have been performed by A. A. Allen, such as curing blindness, cancer, arthritis, making the deaf and dumb speak and hear, and lengthening short limbs. 4. Contributions received from radio and television broadcasts in the United States and foreign countries. These programs were known as the "Allen Revival Hour." 5. Sales of religious music records and tape recordings. *78 Petitioner made its own records and advertised them for sale. 6. Sales of Holy Bibles, pictures, and other miscellaneous religious items. All publications of the petitioner were furnished without cost to those persons who requested them if they stated they could not afford to pay for them. Petitioner regularly received and answered mail inquiries seeking advice, counsel, and prayer relating to religious matters. Approximately two-thirds of the letters and correspondence received by petitioner were devoted to "healing." The petitioner received 5,000 letters per week and about two-thirds of these contained money. All incoming mail is deposited on a large table around which the petitioner's regular employees are seated in an open room. The employees individually initial letters containing no money in the right hand corner and deposit them in a basket labeled "No Money Mail." As to letters containing money, the employee who opens the letter posts the amount of the money contained on the letter and places her initials beneath this amount. The employee then clips the money to the bottom of the letter and places it in a designated basket. It is marked money order, currency, or stamps. *79 Letters containing money are clipped together in groups of 10 and then transferred to the banking room. There one employee removes the money from the letter and checks the amount of it against the amount endorsed by the opener on a corner of the letter. The money is then passed along to an employee operating an adding machine who totals the money noted on the letters. Records were kept of all money received. Some of the letters contain personal "love offerings" for Reverend A. A. Allen. When the sender of the letter specifically indicated the enclosure to be a personal "love offering" for Reverend Allen, such moneys were turned over to him directly. Most of the correspondence emanating from petitioner was comprised of official receipts and form letters requiring no personal signature. Some of the letters sent out by petitioner consisted of form paragraphs previously composed by A. A. Allen or Lexie Allen that were typed on automatic typewriters. Letters addressed personally to A. A. Allen were not handled in the ordinary mail processing. These letters were opened by his secretary and those which required a personal answer were forwarded to him in the field. None of the petitioner's *80 outgoing mail discussed political matters or suggested political opinions. Petitioner did not participate in any political campaigns. Petitioner's radio broadcasts and television programs contain nothing advocating any change in legislation, nor did they promote any individual's political campaign. None of the subjects taught in petitioner's schools and none of the teachings in such schools has been intended or designed to inculcate any particular political philosophy in the students. Rent-free houses in Texas and Arizona were furnished by petitioner to A. A. Allen and Lexie Allen. Petitioner also owned a small "Missionary House," which was occupied part of the time by a minister from Cuba, who was in charge of its foreign radio programs. The petitioner authorized and paid the actual traveling expenses of A. A. Allen, Lexie Allen, and others when they were away from the headquarters office incident to their employment. The petitioner also authorized, in the minutes of the board of directors meeting on June 14, 1957, that "love offerings" could be solicited and retained by A. A. Allen personally at the tent revivals, as follows: the people of his congregations shall be given *81 an opportunity to give a love offering for his support at least once during each campaign. Should it be the judgment of the directors that additional love offerings are needed in order to provide adequate compensation, it shall be permissable, [permissible] at their discretion, to receive such additional offerings. A. A. Allen received "love offerings" during 1958 and 1959 in the respective amounts of $21,925.71 and $18,921.26. In addition to A. A. Allen, "love offerings" were received by H. Kent Rogers and Robert W. Schambach, both of whom were ministers participating in the various campaigns and religious revival meetings conducted by petitioner. The petitioner paid the following salaries to A. A. Allen and Lexie Allen for services rendered to it: 1958
A. A. Allen
$7,800
Lexie Allen
5,090
1959
A. A. Allen
$7,800
Lexie Allen
5,200.20
On the books of A. A. Allen Revivals, Inc., the Oregon corporation, there are closing and adjusting entries as of May 31, 1957, which state that the recorded notes payable to A. A. Allen were paid in full and that all accounts due officers were paid in full as of that date. The opening entries in the general ledger *82 of petitioner, the Texas corporation, as of June 1, 1957, did not include any liability to A. A. Allen or Lexie Allen. However, on November 9, 1958, an entry was made which caused the books of petitioner to reflect a liability as of June 1, 1957, to A. A. Allen in the amount of $15,171.81. And on March 18, 1959, a check was issued to A. A. Allen in the amount of $6,000 as partial payment of this liability. On October 4, 1957, the petitioner paid the sum of $6,675 to A. A. Allen by check bearing the notation "Note." There is no entry in the books of petitioner recording the existence of such a note and this item was treated on the books of the corporation as 1955 and 1956 travel reimbursement to A. A. Allen. Petitioner made donations of $33,079.52 and $12,898.53 for the fiscal years ended May 31, 1958, and May 31, 1959, to ministers and other religious and charitable organizations. On February 1, 1958, the petitioner obtained an option to purchase 1,120 acres of land in Cochise County, Arizona, from Ben Leindecker, as a site for its Miracle Valley headquarters. The option contract permitted petitioner to acquire the land for a total purchase price of $50,000 ($44.66 per acre). *83 On August 24, 1958, petitioner exercised the option, received its deed, paid Leindecker $5,000 and executed a mortgage on the property in his favor in the amount of $45,000. Since the petitioner was not authorized to engage in real estate subdivision or development, its board of directors authorized on August 1, 1958, the conveyance of 80 acres to Independent Development Company, Inc., which had been incorporated in Texas on June 23, 1958. Its incorporators and directors were A. A. Allen, Lexie Allen, and Robert W. Schambach. On December 12, 1958, Independent Development Company, Inc., issued its check to Leindecker in the amount of $4,000 to be applied against the mortgage and was in part payment of the total purchase price of $10,000 for the 80 acres. On January 9, 1959, Independent Development Company, Inc., issued its check to petitioner in the amount of $6,000 in payment of the balance of the purchase price. It also received a deed which was recorded on January 13, 1959. On March 14, 1959, A. A. Allen, Lexie E. Allen, and Robert W. Schambach incorporated and became stockholders of Miracle Valley Water Company, Inc., whose business, among other things, is "to own, maintain, *84 construct and operate a complete system of water works for the purpose of supplying water to residents of Miracle Valley, and residents of the general area of Miracle Valley." Petitioner's original corporate income tax return for the fiscal year ended May 31, 1959, showed total receipts of $1,232,627.90 and the amended return for that year showed total receipts of $1,375,735.39. The original return also showed total expenditures of $1,373,051.08. Petitioner maintains its records in general ledgers and in general and cash journals. It retained documentary evidence of the receipts, the disbursements, and the financial transactions in which petitioner engaged during the years in issue. Entries and records of financial transactions were made by the petitioner in its books and records in the ordinary course of its daily transactions. The books and records of petitioner for the fiscal year ended May 31, 1958, reflect expenses as follows: Advertising
$ 90,925.35
Gas & Oil
8,819.38
Contributions
33,079.52
Freight
2,070.39
Insurance
9,325.82
Interest
1,347.61
Payroll
180,121.61
Postage
31,840.65
Printing
116,598.28
Professional & Legal
13,467.98
Rent
22,244.42
Repairs & Maintenance
14,495.12
Supplies
82,929.40
Taxes
7,826.85
Telephone & Telegraph
7,116.74
Travel
85,936.38
Utilities
11,256.37
Labor
17,748.87
Radio & Television
232,050.39
Office
444.71
*85 The books and records of petitioner for its fiscal year ended May 31, 1959, reflect the following expenses: Field Unit No. 1
$311,388.18
Printing
19,691.50
Books
25,663.84
Radio & Television
211,377.32
Magazines
64,653.53
Missions
19,931.80
General Fund
167,985.02
S. P. Missions
3,360.00
The books and records of petitioner for the fiscal year ended May 31, 1959, reflect expenditures in connection with the Miracle Valley Training Center, as follows: From the General Ledger
Advertising
$ 11,184.19
Donations
30.00
Freight
60.00
Insurance
2,140.48
Interest
813.58
Payroll
14,705.25
Postage
168.64
Printing
3,215.47
Professional & Legal
634.51
Rent
$ 485.42
Supplies
9,755.01
Taxes
4,235.26
Telephone
1,193.28
Travel
4,181.18
Radio & Television
32.00
Office
10.50
Transferred to Training Cen-
ter Account
260,263.22
Total Per General Ledger
$313,107.99
From the Records of Miracle Valley Training Center: Payment on Ben Lein-
decker Note
$ 5,000.00
Direct Costs of Construc-
tion
142,480.93
Net Payroll
32,977.11
Trees & Shrubs
363.74
Equipment
16,297.91
Livestock - Purchased
405.18
Groceries
18,738.50
Gasoline
9,433.95
Utilities
15,267.50
Repairs to Equipment
7,772.04
Trailer Rental
3,849.75
Feed & Seed
2,857.38
Expense Allowance - Em-
ployees
2,908.95
Office Supplies
241.85
Medical Expense
128.00
Films
206.00
School Supplies
454.63
Freight
546.48
Insurance
19.20
Interest
227.15
Kitchen Supplies
376.00
Miscellaneous Expense
656.40
Miscellaneous Supplies
1,626.27
Petty Cash Reimburse-
ment
3,245.67
Miscellaneous Truck Ex-
pense
123.15
Taxes
241.43
Truck Rental
188.37
Veteranean Fees
28.00
Total Cash Disbursements
$266,661.34
Less: Decrease in Cash
241.84
Balance other than
from Home office
6,156.28
6,398.12
Transfers from Home Office
$260,263.22
*86 The business records of petitioner so maintained reflect that no part of the net earnings of petitioner inured to the benefit of any private individual during the fiscal years ended May 31, 1958, and May 31, 1959. Ultimate Findings 1. The petitioner has established that it was organized and, during the taxable years ended May 31, 1958, and May 31, 1959, was operated exclusively for religious and educational purposes. 2. The petitioner has established that no part of the net earnings of petitioner inured during these taxable years to the benefit of any private shareholder or individual. Opinion Petitioner maintains that it qualifies for exemption under the requirements of the statute [1] and within the framework of our opinion in Saint Germain Foundation, 26 T.C. 648 (1956), acq, 1956-2 C.B. 8. Respondent takes issue with this and contends: (1) that petitioner, although expressly conceded to be a "religious organization," was simultaneously "organized and operated primarily for private gain"; and (2) that petitioner's net earnings "inured" to the benefit of private individuals. We reject respondent's contentions. On this record we are compelled *87 to agree with the petitioner. Careful consideration has been given to the manner in which this case was submitted by the parties. Petitioner set out to prove, and in our judgment has established by sufficient evidence, prima facie case demonstrating that *88 it meets the basic requirements for exemption under section 501(c)(3). In addition to the stipulated facts, which are included in our Findings, the petitioner produced two witnesses. Evelyn M. Kampfer appeared as petitioner's first witness. She has been associated with the petitioner and its predecessor corporation from the time of the latter's organization in 1951. During such period she has been in charge of petitioner's mail department. She was also a member of the board of directors. Evelyn Kampfer described the religious services conducted by petitioner at its headquarters and in the field. She testified that, except for the conduct of its schools, petitioner's activities were exclusively religious in character and that it did not devote any part of its activities to an attempt to influence legislation by propaganda or otherwise. Her forthright testimony was unimpeached and uncontradicted. James P. Holloway appeared as petitioner's second witness. He testified from his personal knowledge of petitioner's affairs and as its accountant. He holds a degree in accounting from the University of Texas and he was employed by the Internal Revenue Service from December 1945 until April 10, 1953, at *89 which time he resigned as Head of the Intelligence Division in the Dallas office. He is an independent certified public accountant. Holloway testified that petitioner's books consisted of a general ledger, a general journal or cash journal, and documentary proof of disbursements and receipts. He stated that he had been employed to familiarize himself with the records and to prepare the exemption application. He further stated that he had examined petitioner's records to an extent and depth sufficient to enable him to form and express a professional opinion. It was his opinion that none of petitioner's profits inured to the benefit of any individual; that petitioner retained all of its earnings; and that none of them were dissipated to any individual. His testimony was likewise unimpeached and uncontradicted. At this point, even after two audit examinations and the extensive exercise of his subpoena power, [2] the respondent rested and did not choose to go forward with evidence necessary to rebut petitioner's prima facie case. If there are any inadequacies in this record, then the responsibility therefor must be borne by the respondent. If there is a presumption arising from the failure *90 to present available evidence, that presumption here must work against the respondent because the petitioner was not required to offer evidence in anticipation of every fact which the respondent may now seek to contend. Clara O. Beers, 34 B.T.A. 754 (1936). The burden shifted to the respondent, but he did not choose to present any additional evidence. Accordingly, we think his determination cannot stand. Under the First Amendment to the Constitution, the decisions of the Supreme Court of the United States and the decisions of this Court, we are not free to distinguish between or to approve or disapprove of one form or expression of religious faith. See Reynolds v. United States, *91 98 U.S. (1879); Fowler v. State of Rhode Island, 345 U.S. 67 (1953); and Saint Germain Foundation, supra. It is clear that the petitioner was formally organized as a religious corporation under the laws of the State of Texas and counsel for respondent has conceded that it is a "religious organization." Petitioner conducts religious worship services through ordained ministers. They regularly perform the sacerdotal functions of baptism and marriage; they preach and lead prayer; they lead in the singing of hymns. Petitioner has also adopted a doctrinal statement or profession of faith which sets forth its tenets and beliefs. This embraces the beliefs, the religious concepts, and faith of its ministers, its workers, and its followers. Its activities and its guiding principles represent the faith, creed, and religious observance of thousands of people who worship at its meetings and support its activities by their efforts and contributions. Even if its activities might be considered a departure from the norm and even though it is not alined with any one of the larger religious sects or denominations most commonly considered as "religious," it nevertheless represents *92 to its adherents their form of worship. As we said (p. 70) in the case of Unity School of Christianity, 4 B.T.A. 61 (1926): * * * Religion is not confined to a sect or a ritual. The symbols of religion to one are anathema to another. What one may regard as charity another may scorn as foolish waste. And even education is to-day not free from divergence of view as to its validity. Congress left open the door of tax exemption to all corporations meeting the test, the restriction being not as to species of religion, charity, science or education under which they might operate, but as to the use of its profits and the exclusive purpose of its existence. The purpose behind petitioner's organization was religious. And the means employed in attaining that purpose were education, exhortation, personal and public contact and by example. "Purpose" is not means; it is "that which a person sets forth before himself as an object to be reached or accomplished; intention; design." The word "organized" *93 means "created to perform" or "established to promote." Samuel Friedland Foundation v. United States, 144 F. Supp. 74 (D.C.N.J. 1956). The word "operated" refers to the actual activities of the organization. Sebastion-Lathe Co. v. Johnson, 110 F. Supp. 245 (D.C.N.Y. 1952). With respect to the word "exclusively," it has been held that the presence of a single nonexempt purpose, if substantial in character, will destroy the exemption regardless of the number or importance of truly exempt purposes since the organization is not devoted exclusively to exempt purposes in such a case. See Better Business Bureau v. United States, 326 U.S. 279 (1945). On the other hand, the presence of a nonexempt purpose or activity which is not substantial in character will not affect the situation and the organization remains "exclusively" one for exempt purposes. Estate of Philip R. Thayer, 24 T.C. 384 (1955). It is significant that in Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578 (1924), the Supreme Court had this to say in distinguishing between the "purpose" of an organization and the material process through which that *94 purpose is sought: Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain. Such activities cannot be carried on without money; and it is common knowledge that they are largely carried on with income received from properties dedicated to their pursuit. This is particularly true of many charitable, scientific and educational corporations and is measurably true of some religious corporations. Making such properties productive to the end that the income may be thus used does not alter or enlarge the purposes for which the corporation is created and conducted. Thus, profitable or even competitive activities in furtherance of petitioner's religious purpose do not affect its right to exemption. Unity School of Christianity, supra. It is relevant, however, that the petitioner devoted during these years all of its gross receipts to the religious purpose for which it was organized. There are several arguments advanced by the respondent which *95 warrant comment. First, respondent urges that the petitioner's religious and educational activities are incidental to its "miraculous healing" and "commercial" activities, such as the publication and sale of its magazines, books, pamphlets, Bibles, music records, tape recordings, and pictures. He submits that "miraculous healing" does not represent a religious function and the money received from it is as taxable as the income received from healing by doctors, dentists, osteopaths, and chiropractors. We are not persuaded by this argument. Reliance upon divine healing is a basic tenet of several religious organizations, among which are the Church of Christ Scientist and the Pentecostal Church of God. These religious groups subscribe to the Biblical promise of "miraculous healing." It is true that petitioner derived part of its income from the publication and sale or distribution of the Miracle Magazine, religious books, pamphlets, records, pictures, and Holy Bibles. But this is a common method of carrying out the religious and educational purposes of any exempt organization; and the mere fact that an otherwise exempt organization derives income from the sale of such material does *96 not affect its right to exemption. Unity Church of Christianity, supra; Saint Germain Foundation, supra; and Forest Press, Inc., 22 T.C. 265 (1954). There is nothing in this record to show that the receipts from these publications were not devoted to the promulgation of petitioner's religious beliefs. It appears from the evidence that the sale and publication of such material did advance the religious purposes of the organization. The question is not whether the petitioner made or lost money, but whether the purpose of those earnings and the goals to which they were devoted are within the purview of favored tax treatment. The statute recognizes the probability that an exempt organization will realize "net earnings." However, it is not the realization of such earnings but their inurement to private individuals which the statute proscribes. We are satisfied from the evidence presented that the petitioner was not operated in these years for "private gain." The second facet of respondent's position is that, in several ways, the net earnings of petitioner were diverted to the benefit of private individuals, particularly the Allens. We turn now *97 to a consideration of the points advanced. 1. Love offerings. Respondent argues that "love offerings" made to Reverend Allen, Lexie Allen, Robert Schambach, and to other ministers constitute the "inurement" of petitioner's net earnings to those individuals. We passed on this very question in Saint Germain Foundation, supra, and decided it against the respondent. We adhere to that view here. Moreover, the "love offerings," coupled with the relatively small salaries, paid to the Allens do not appear to be unreasonable when one considers the services performed by them for the organization. 2. Cash outlays. The usual and normal expenses of a religious organization do not constitute any part of its "net" earnings. Instead, the term "net earnings" is intended to reflect accumulations after the payment of ordinary and necessary expenses and capital outlays needed to carry out the purpose of the religious organization. In this context, most of respondent's objections to petitioner's expenditures are simply to legitimate items of expense which represent no part of its "net earnings. *98 " See Morey v. Riddell, 205 F. s/upp. 918 (D.C.Calif. 1962). We see nothing strange in petitioner's payment of reasonable travel expenses of the Allens and its other employees. We also do not view with suspicion the petitioner's note for $6,675 and its payment to A. A. Allen. This amount represented cash expended by the Reverend Allen in the payment of his own travel expenses while in the service of A. A. Allen Revivals, Inc., the Oregon corporation. That corporation's obligation to reimburse these expenses was assumed by petitioner. We do not regard this as "inurement." We think the account payable to Reverend Allen of $15,171.81 posted on petitioner's books is merely what it appears to be - a duly entered record of the petitioner's assumed obligation. Respondent contends, with no support in the record, that such amount "had previously been paid to A. A. Allen by the corporation." If that amount had been previously paid, it was in respondent's power to demonstrate that fact by evidence. Failing any offer of evidence available to him, respondent cannot now disclaim the propriety of the entry of this account on the petitioner's books. We are unwilling to substitute doubt and suspicion *99 for evidence. Petitioner made donations to ministers who sponsored its field campaign or who required financial assistance in their advancement of its religious purposes. Respondent's statutory notice of deficiency took no exception to the deductibility of these charitable contributions. Yet, in his brief, respondent suggests that the donations represent "inurement" of petitioner's net earnings. This contention is without merit. 3. Rent-free houses. The furnishing of rent-free houses to the Allens in Texas and Arizona does not constitute "inurement." See section 107, Internal Revenue Code of 1954, and the regulations relating thereto. 4. Independent Development Company. On February 1, 1958, petitioner optioned 1,120 acres in Arizona as a site for its headquarters. The agreed price was $50,000 ($44.66 per acre). The option was exercised on April 24, 1958, and $5,000 was paid in cash. The balance was deferred. Petitioner was not authorized to engage in real estate subdivision or development. On August 1, 1958, petitioner's directors authorized the conveyance of 80 acres to the Independent Development Company, and $10,000 ( $125 per acre) was paid by Independent *100 Development Company for the 80 acres before the land was deeded to it. It then undertook to prepare homesites and advertise lots for sale to residents and those desiring to live in Miracle Valley. As we view this transaction, Independent Development Company sold property for full value. No "inurement of net earnings" can result from that. 5. Miracle Valley Water Company. Respondent next characterizes the corporation known as Miracle Valley Water Company as a vehicle for the "inurement of net earnings" to shareholders or private individuals. Nothing whatsoever passed from petitioner to Miracle Valley Water Company. Consequently, we find no basis for respondent's suggestion of "inurement." Petitioner could not act as a water company, nor could Independent Development Company. Yet water had to be supplied to Miracle Valley. 6. Control by board of directors. Finally, the respondent contends that if the petitioner is liquidated, dissolved or abandoned, its assets may be disposed of in any manner which the board of directors deems "right and proper." But this contention is immediately foreclosed when respondent recognizes that the assets of petitioner are "irrevocably dedicated to charitable *101 purposes." In any event, this does not constitute "inurement" in the taxable years before us. Viewing the record as a whole, we conclude that the petitioner, during the years here involved, qualified as exempt from taxation under the provisions of section 501(c)(3). Decision will be entered for the petitioner. Footnotes
1. SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC. (c) List of Exempt Organizations. - The following organizations are referred to in subsection (a): * * *
(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.↩
2. Respondent served upon petitioner a Subpoena Duces Tecum requesting the production of voluminous records and documents. Petitioner's counsel filed a Motion to Quash Subpoena, arguments were heard on the motion, and the petitioner was ordered to produce almost all of the books, records, and documents subpoenaed. They were produced and were present in the courtroom during the trial of this case.↩