The **AKRON CLINIC FOUNDATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**Civ. A. No. 36795.**

United States District Court
N. D. Ohio, E. D.
Jan. 17, 1964.

M. R. Schlesinger and Lawrence G. Knecht, Cleveland, Ohio, for plaintiff. The United States was represented by the District Attorney.

CONNELL, Chief Judge.

The Plaintiff, The Akron Clinic Foundation, hereafter referred to as the Foundation or the taxpayer, has brought this action under Section 1346(a) of Title 28, U.S.C.A. seeking the recovery of certain monies allegedly "erroneously, excessively and illegally assessed" against it and collected by the District Director of Internal Revenue. Briefly, the Foundation bases its claim for refund upon a contention that it qualifies as an organization organized and operated exclusively for charitable, scientific, and educational purposes under Section 501(c) (3) of the Internal Revenue Code of 1954, and is therefore entitled to the "charitable exemption" because it is not barred by operation of Sections 502, 503 and 504 of the Code. The Government defends upon three grounds: (1) that the Foundation has accumulated amounts of income which are unreasonable under Section 504(a) (1); (2) that the accumulated income has been used to a substantial degree for purposes and functions other than those constituting the basis for the exemption in violation of Section 504(a) (2); and (3) that the Foundation is not operated exclusively for purposes specified in Section 501(c) (3). By an amendment to an amended answer, the Government raised the issue of estoppel against this taxpayer, but this defense is not urged in the later briefs.

*The Facts*

The parties to this law suit have filed a stipulation of facts and submitted joint exhibits. The evidentiary facts are not in dispute, only their legal significance. The following summary is not meant to be exhaustive, nor meant to constitute a complete finding of facts; its function herein is to provide the factual background for the discussion of the applicable legal principles which follows.

*The Beginnings of the Foundation*

In 1948, Drs. W. S. Henderson, R. F. Jukes, F. J. Fowler, R. G. Pearce and R. D. Brubaker were engaged in medical practice in the City of Akron as partners, under the name of Akron Clinic; that partnership, and the association which succeeded it as hereinafter stated, are sometimes hereinafter referred to as the "medical group." In 1948, the aforesaid doctors owned all of the stock of a corporation, Akron Clinic, Inc., which corporation owned the land and building occupied by the medical group, and all of the equipment used therein. Akron Clinic, Inc. and the medical group were organizations operated for profit.

On December 28, 1948, Akron Clinic Foundation was incorporated, all of the medical group acting as incorporators, as a corporation not for profit under the law of the State of Ohio. The Articles of Incorporation specify among other things that: (1) that the corporation shall be operated exclusively for charitable, scientific and educational purposes, including the aid of the sick and disabled; the study of the causes, characteristics, prevention and cure of human ailments and injuries; and problems of general public hygiene and health, and the promotion of medical, surgical and scientific research, knowledge and education; (2) that the plan of operation of this corporation shall be to receive by purchase, gift or otherwise, real or personal property of any nature, to hold, use, improve, lease, etc. such property, and to borrow money to improve such

property, mortgaging such property to secure any debts so incurred; (3) that all net income shall be used exclusively for the promotion of its charitable, scientific and educational purposes; (4) that no part of the property or net income shall ever inure to the benefit of any private individual; (5) that in the event of dissolution of this corporation, all of the assets are to be delivered over to the College of Medicine of Western Reserve University; and (6) that the amount of property which it may hold is fixed at Two Million Dollars.

During December 1948 and January 1949, the doctors of the medical group donated all of the capital stock of Akron Clinic, Inc. to the Foundation. On January 25, 1949, the Foundation as sole stockholder of Akron Clinic, Inc. caused that corporation to be completely liquidated, thereby acquiring all of the assets of that corporation, subject to all of its liabilities. The principal assets of Akron Clinic, Inc. were certain land and building then occupied by the medical group, and the equipment, furniture and fixtures therein.

The beginnings of the Foundation, as revealed in the Balance Sheet of January 25, 1949, show total assets of $89,714.11; a mortgage payable of $24,753.98; and a net worth consisting entirely of the donated surplus of $63,946.67. The succeeding years show a growth in total assets; a variation in fixed liabilities due to mortgage payments and occasional additional mortgages to secure improvements; and the growth of net worth due to increments in donated surplus until the year 1954 and a new item, General Surplus, which represents approximately the excess of rental income over expenses and charitable dispositions.

*The Actual Operation of the Foundation*

The articles of incorporation of the Foundation provide for a number of trustees, from three to nine, who are to conduct the business. At the inception of the Foundation, the trustees numbered seven, five of whom were the doctors of the medical group. Since that time the control of the Foundation has passed to disinterested lay people, outstanding citizens of Akron; from 1950, the majority of the trustees have been non-members of the medical group.

The trustees collectively exercise the powers of the articles. On January 26, 1949, the Foundation entered into a twenty-five year lease with the Akron Clinic, the medical group, with a perpetual option to renew for twenty-five year periods. The lease covered all the real and personal property of the Foundation, and its fairness has not been called into question. Specifically, the adequacy of the rental rate, which has been periodically revised upwardly, is admitted for the purposes of this case.

The other activities of the trustees have been the authorization of the various improvements and expansions of the real and personal property of the taxpayer, and the hypothecation of certain properties to secure financing. The foregoing are primarily business decisions whose wisdom are not here called into question. The membership of the board of trustees naturally include prominent, experienced businessmen of the area.

The uncontradicted testimony of one of the trustees was that except for the denial of the charitable exemption in the year of 1954 the Foundation would already be solvent and capable of devoting the bulk of its income to charitable purposes. Support for this proposition can be drawn from the fact that charitable contributions to the Foundation ended in 1954. Although some contributions were specifically denominated for the building fund, it is incontestible that the bulk of contributions to the Foundation were directed to the reduction of its debt. In properly interpreting the effect of the denial of the exemption to the taxpayer, the shutting off of the flow of contributions must be considered along with the increase in tax liability.

There was further uncontradicted testimony that the Foundation would soon be out of debt, even without the benefit of the exemption and so would then be

able to devote a much greater portion of its income to charitable purposes.

*The Financial Picture of the Foundation*

The periods under consideration in the tables below are divided into those years in which the taxpayer enjoyed the charitable exemption, that is up to and including 1954; the years in suit, that is 1955, 1956 and 1957; and the years subsequent, up through 1961.

| | Through 1954 | 1955–1957 | 1958–1961 | Total |
|---|---|---|---|---|
| *Improvements and additions to fixed assets | 229,246.55 | 66,695.21 | 179,745.82 | 475,687.58 |
| Additions and Reductions to Fixed Liabilities | +69,594.97 | −33,455.66 | −6,101.37 | +30,037.94 |
| Net Income | 75,178.02 | 84,122.54 | 111,386.15 | 270,686.71 |
| Donations Received | 161,885.66 | | 1,000.00 | 162,885.66 |
| Charitable Dispersals | 17,550.00 | 1,966.25 | 3,400.00 | 22,916.25 |

*Includes Land, Buildings, Furniture, Fixtures, and Medical Equipment.

———◆———

From the Balance Sheets of the Foundation, the following summary of the Foundation's financial situation at the end of each of the above periods was drawn.

| | 1–25–49 | 12–31–54 | 12–31–57 | 12–31–61 |
|---|---|---|---|---|
| Total Fixed Assets | 89,391.59 | 254,038.40 | 281,505.29 | 355,962.73 |
| Total Fixed Liabilities | 24,753.98 | 94,348.95 | 60,892.29 | 54,791.92 |
| Donated Surplus | 63,946.67 | 161,885.66 | 161,885.66 | 161,385.66 |
| General Surplus | | 55,103.00 | 123,481.53 | 210,639.43 |

———◆———

The preceding tables do not purport to give a complete description of the financial operations of the Foundation.

They necessarily omit figures essential to a judgment of the prudence of the investment program, of the expansion of facilities, or of the ratio of capital to income. However, none of these matters are properly before us. They do present in a capsulized form the financial picture at crucial stages affording the opportunity for some comparisons.

Thus, from inception through 1954 when the Foundation enjoyed the charitable exemption, it was able to make improvements of $229,246.55 while only increasing its mortgage indebtedness less than one-third that amount. In the same period, it received contributions of $161,885.66 which explains much of the above disparity between improvements and debt, while it managed to devote $17,550.00 to charitable purposes. In addition, the Foundation showed a General Surplus of $55,103.00 for the period.

Turning to the period in suit, the picture changes abruptly. While limiting improvements to $66,695.21, the debt

was reduced by only $33,455.66. This again is partially explainable by the fact that charitable donations to the Foundation for this period had ceased entirely. Accordingly, contributions by the Foundation dropped to $1,966.25, while General Surplus rose to $123,481.53.

To complete the picture to the last date when figures are available, through 1961, improvements of $179,745.82 were made while the debt was reduced $6,101.37. Donations received were minimal, $1,000.00, while charitable dispositions by the Foundation amounted to only $3,400.00. General Surplus reached the total of $210,639.43.

Thus, at the end of 1961, the Foundation showed total fixed assets of $355,962.73, with a mortgage debt of $54,791.92. General Surplus exceeded the Donated Surplus by a good margin, having surpassed that figure at the end of 1959, five years after charitable contributions to the Foundation had ceased.

The Government proceeded on three alternative theories in denying the exemption to the taxpayer in this case. However, their principal reliance at trial and in their briefs was upon the first of these, to wit: that the taxpayer had unreasonably accumulated income in violation of Section 504(a) (1). Implicit in this assertion is the premise that the taxpayer's use of income to reduce its original debt and the debts thereafter acquired in improving and adding to its property was in effect an accumulation of income, and that the difference between this sort of deficit financing and an extended plan of accumulation of income is only formal. The Government contends, therefore, for the proposition that the taxpayer's history of debt and use of income to reduce that debt is to be equated with an accumulation of income for the purposes of the statute, and that amounts of income dedicated to the reduction of the debt are to be viewed as accumulated income and tested for reasonability under Section 504(a) (1) according to the body of law developed thereunder.

Under Section 504, the exemption "shall be denied for the taxable year if the amounts accumulated out of income during the taxable year or any prior taxable year and *not actually paid out* by the end of the taxable year * * * are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose or function constituting the basis for exemption * * *." (Emphasis supplied.)

The Government has referred us to no authority for the proposition that the present situation of debt-financing and debt reduction is an accumulation of income, and our own research has not revealed any such authority. The Government's brief limits itself to the insistence that there is no essential difference between an accumulation of an amount in the first case, and a borrowing of the same amount to invest with the income used to reduce the debt. In either event, the result after a period of years should be approximately the same, to wit: a debt free fund of capital.

In the only case in which the point was mentioned, the Tax Court assumed without deciding that such a procedure was an accumulation under Section 504, but held for the tax payer anyway. A. Shiffman v. Commissioner, 32 T.C. 1073 (1959)

We are similarly reluctant to hold that the method of debt financing and devotion of income to retire that debt herein involved is in the view of the law an accumulation of income. We take the time here to point out the difficulties of such a holding.

First, the statute defines accumulation only inferentially as income "not actually paid out by the end of the taxable year." Obviously, in the present case, the income was generally paid out each year. Two alternatives come to mind. Either income devoted to retirement of debt is income paid out, or else the statute is simply not broad enough to cover the present situation.

Secondly, if income devoted to debt retirement is an accumulation, the tax

payer foundation established with a debt is inevitably committed to an accumulation in order to be debt free—this before any operations have commenced.

Thirdly, an indebted charity would be forced to walk the line between devoting most of its income to debt retirement in order to avoid an accumulation unreasonable in length, and the alternative, to devote most of its income to exempt purposes to avoid the charge of an unreasonable percentage of accumulation and failure to fulfill the purposes upon which the exemption was based. The present case illustrates the possibility of such a dilemma.

Even if the Government is correct in its contention that the present case presents an instance of accumulation within Section 504, we hold that such accumulation was not unreasonable.

The Government presses upon us the case of Friedland Foundation v. United States, 144 F.Supp. 74, (D.C.N.J.1956) as establishing the test for the reasonableness of accumulations. However, that case deals with the accumulation of an idle fund to a fixed dollar amount over a period of years for a fixed purpose.

Simply speaking, that test cannot apply when the capital as here is not a liquid fund for investment purposes. Where the sole capital is one piece of rental property, the question of dollar amount of accumulation permissible seems to have no relation to the question.

Further, the questions of length of accumulation and fixed purpose of accumulation seem to be only appropriate to an uncommitted fund.

In Shiffman (supra), the Court applied the Friedland test, but in a situation where the indebtedness on the property had been retired, and a plan for the disposition of an imminent, debt-free accumulation had been formulated, it is a matter of conjecture whether the Friedland test would have been applied if an actual accumulation were not imminent.

In the case now before us, there is not an actual accumulation of debt-free capital, although the likelihood of one in the near future is admitted by all parties. The Foundation intends to commit that fund immediately to tax exempt purposes.

During the period in suit, however, we believe the question to be a different one. The trustees are committed to the management of one rental property to produce income for charitable purposes. Their conduct of the Foundation's business involved the maintenance of the property, the investment of income to insure the continued tenancy of its principal tenants, the exaction of a fair rent and the disposition of income according to the purposes of the charter.

There can be no doubt that they would not fulfill their role if they devoted all rental income to charity, neglecting maintenance of the property and even the retirement of current debt. In such a case, such gross misconduct would lead to the hasty demise of the entire Foundation and the dissipation of its capital. It must be admitted that some division of income is necessary.

There has been no allegation of impropriety on the part of the trustees. More to the point, this is not an instance where the Foundation was controlled by parties with a direct interest in its operation. The trustees generally are civic leaders of the community, neither doctors nor tenants.

We hold specifically that the matter of investment and division of income lies within the honest, disinterested judgment of the trustees; that the division of income between investment and charitable dispersals was not unreasonable in view of the original capital picture, the subsequent enhancement in property value and income and the likelihood of an impending debt-free future with a valuable income producing property irrevocably dedicated to charity.

If the foregoing amounts to accumulation of income, we hold that it is not unreasonable in duration or amount. It seems only common sense that such an

"accumulation" endures as long as the debt. The Government is forced to the contention that the accumulation was unreasonable, because the additions and improvements were unreasonable. On the basis of the evidence, we cannot so hold.

As to the other contentions, for the above reason, we hold that the taxpayer has not used accumulated income to a substantial degree for purposes or functions other than those constituting the basis for exemption; and that it has been operated exclusively for exempt purposes.

This opinion and the agreed stipulation of facts are adopted as the Courts Findings of Fact and Conclusions of Law.